2006 VT 2

**Lawrence N. Kasser v. Eileen M. Kasser**

[895 A.2d 134]

No. 03-065

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed January 6, 2006

*Matthew T. Birmingham, III* of *Birmingham & Moore, P.C.,* Ludlow, for Plaintiff-Appellee.

*Martha M. Davis* of *Law Office of Martha M. Davis,* Windsor, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** Wife Eileen M. Kasser appeals from the family court's final divorce order, which divided the parties' sizeable marital estate. The parties' wealth stems largely from hotel investments, title to which are held by husband Lawrence N. Kasser and various trusts. Husband and wife agreed that, in dividing the marital estate, the court should not liquidate the hotel properties, nor should it invade the trusts. The family court assessed the value of the hotel properties and the trusts, in addition to other assets, and determined the portion attributable to the marital estate. Wife argues that the court abused its discretion in determining the value of the marital estate, dividing the marital assets, and calculating maintenance. We affirm.

¶ 2. The family court made the following findings. Husband and wife were married in 1980. They have three children together, two of whom are in college, and one of whom, a minor, attends a private boarding school. Husband was born in 1943, and he was trained as an architect. Wife was born in 1949, and she holds a bachelor's degree in fine arts. The parties moved to Vermont in 1981. Since that time, with one small exception, wife has been a full-time homemaker. Between 1981 and

1988, husband worked as an architect. During this time, the parties enjoyed a modest lifestyle.

¶ 3. In 1987, husband began acquiring hotel properties. In 1988, husband received $1,400,000 from the sale of a family business, and he closed his architectural practice. In 1991, husband's father died. Husband's share of the estate, $750,000, was placed in the Lawrence Kasser Irrevocable Trust. This trust pays income to husband for life. When husband dies, the parties' children receive the income and, eventually, the principal. The parties also created irrevocable trusts in their children's names, and they regularly contributed the maximum amount allowed by law to each trust, i.e., $60,000 per year. After 1994, husband became more involved in the purchase of hotel properties. The parties' lifestyle improved, and they became affluent.

¶ 4. In late 1996, wife became disenchanted with husband and with her life in Vermont. She contemplated divorce. In the summer of 1997, she moved to Boston, where husband and the parties' minor child later joined her. In June 1998, husband and child returned to Vermont. In February 1999, husband initiated divorce proceedings.

¶ 5. The family court held a five-day hearing and issued a lengthy final divorce order in January 2003. The court first assessed the value of eight hotel properties, relying heavily on testimony provided by husband's expert, whom it found credible. The court found that the first hotel property, referred to as the "Exit 6" property, was worth $60,000, and it was owned by the children's trusts. A second property, the Springfield Holiday Inn, was owned by a subchapter S corporation called Preferred Motor Inns of New England, Inc. (PMI). The children's trusts held 99% of the PMI stock, while husband owned 1%. The court found that the Springfield property was worth $1,400,000, and husband's 1% share was worth $14,000. Husband also owned a 50% share in a Holiday Inn in Weirton, West Virginia. This hotel had a net equity value of negative $1,170,000, and husband's 50% share was negative $585,000. The court also assessed the value of five additional hotel properties in which husband held a 50% interest.

¶ 6. Based on its findings, the court concluded that the full net equity value of the eight hotel properties was $7,499,000. Taking husband's 1% interest in the Springfield Holiday Inn into account, the court found that husband's interest in these hotels was $3,064,000. The court recognized that the parties sharply disagreed as to the value of husband's interests in the various hotel properties, particularly the effect of husband's 50% ownership. The court rejected husband's argument that his "minority" shares were without value, and instead

found that husband's partial ownership diminished the present value of his interest by 25%-33%. The court thus found that husband's interest in the hotel properties was worth between $2,000,000 and $2,225,000.

¶ 7. The court turned next to the Lawrence Kasser Irrevocable Trust, which had a value of $850,000. The court found that husband received approximately $1250 per month in income from the trust, and he also used the trust as a source of borrowing for his hotel investments. The court explained that husband had a limited right to invade the principal of the trust for his benefit during his lifetime, but a prudent fiduciary would not exercise that right absent dire need, which appeared unlikely given husband's financial situation. Thus, because husband did not have an unlimited right to the principal, the court considered this asset as a source of income only. The court determined the value and ownership of numerous other assets, including a condominium in New York City and three condominiums in Vermont owned primarily by the children's trusts.

¶ 8. The court found that husband also had an investment account, called the Streamway Investment Account, with a value of $551,673. The bulk of the account's assets were in three promissory notes. One note had a face value of $200,000, but it did not pay interest and was not being amortized. A second note was from PMI for $250,000, which paid $2000 in monthly interest. A third note from the Falmouth Motel for $100,000 paid $1250 in monthly interest. The account also held a small investment in another entity, which had a value of $1784. The court found that, in total, husband received $3250 per month in interest from the Streamway account.

¶ 9. Based on extensive findings, the court concluded that the gross marital estate was worth approximately $3,160,000. The court arrived at this figure by adding together the diminished value of the hotel/motel properties ($2,100,000), the net value of the marital homestead ($285,000), husband's interest in a company called Vermont Teas ($30,000), husband's IRA accounts ($118,000), wife's IRA ($27,000), two cars ($15,000), the Streamway Investment Account ($551,500), husband's personal checking account ($5000), husband's interest in another business ($10,000), and a tractor ($20,000). The court considered this a somewhat flexible figure given the nature of the marital assets and the many variables inherent in the valuation process.

¶ 10. In reaching its conclusion, the court considered wife's assertion that the value of the PMI stock, the Exit 6 property, and the New York and Vermont condominiums held by the children's trusts should be considered marital assets. Wife argued that husband had transferred

these assets to the children's trusts in fraud of her rights in the marital estate. The court rejected this argument and found that the establishment of the children's trusts, and the contributions to them and their management, had been prudent and not done with any purpose to deplete the marital estate. The court found that husband had faithfully contributed to these trusts the maximum amount allowed by the gift tax law, i.e., $20,000 per child or $60,000 per year. The court explained that wife was aware of the establishment of the children's trusts and was generally aware of the transactions taking place with respect to them. Based on these and other findings, the court found that husband's actions had been undertaken with the intent of wisely providing for the children's future while preserving a source of income and borrowing.

¶ 11. The court next considered how best to distribute the marital assets, mindful of the parties' stipulation that the assets not be liquidated nor the trusts invaded. In addition to other assets, the court awarded husband his interests in the hotel businesses and related entities, as well as his interests in the various trusts. Husband received the marital home, with a net value of $285,000. He was ordered to pay wife $345,000 to offset this award, which the court considered a partial division of the overall marital estate. Husband was also ordered to pay wife $300,000 as an additional distribution of cash in lieu of marital property, payable in ten annual payments of $30,000 at a 6% interest rate, plus interest on the unpaid balance at a rate of 6% per year. Husband was also ordered to buy wife a new car at a cost of $40,000, maintain health insurance for wife, and name wife as a beneficiary in his life insurance policy. Based on a pretrial stipulation between the parties, the court also ordered husband to pay the "reasonable" expenses of wife's financial expert. The court found that of the $37,465 that remained outstanding on the expert's bill, $20,000 was reasonable and should be paid by husband. The court held wife responsible for the balance.

¶ 12. The court turned next to maintenance. It found that the parties had enjoyed an affluent lifestyle and wife had no income other than the $3500 per month that husband was paying during the divorce proceedings. The court noted that husband had also been paying for all of wife's household expenses, including the mortgage, during this period, and thus the $3500 monthly payment had been available to wife solely for her personal needs. Based on numerous findings, the court concluded that, in light of its distribution of the marital estate, including the $712,000 awarded to wife ($345,000 in cash; $300,000 payable over

ten years at 6% interest; her IRA worth $27,000; and a $40,000 car), and considering the factors set forth in 15 V.S.A. § 752, wife's reasonable needs, as best could be determined absent reliable evidence from her, were approximately $6000 per month.

¶ 13. The court found it difficult to determine husband's monthly income given the nature of his hotel holdings, and the fact that his tax returns did not necessarily reflect income that was actually available to him. Based on numerous findings, the court concluded that husband earned $25,000 per month, or $300,000 per year. In evaluating husband's expenses, the court noted that husband offered to pay the full educational expenses of his two eldest children, without objection from wife. He also agreed to pay the educational expenses of the parties' youngest child, who was enrolled in private school. The court considered these payments as a factor in the income-expense analysis. Taking all of the evidence into consideration, the court concluded that husband's reasonable personal expenses were $15,000 per month.

¶ 14. Based on its findings, the court ordered husband to pay wife $5500 per month beginning in February 2003, $6500 per month beginning July 1, 2003, and $7500 per month beginning in July 2006. In other words, wife will receive $78,000 per year in maintenance between July 2003 and July 2006, and $90,000 per year thereafter. Wife appealed from the court's final order.

¶ 15. Wife first argues that the family court erred in calculating the value of the marital estate. She asserts that the court should have included the value of the PMI stock and the Exit 6 property because husband transferred these assets to the children with the intent to deprive her of her fair share of the marital estate. Wife maintains that she was not notified of the transfers, nor did she consent to them. According to wife, husband continues to treat PMI as his own property despite the stock transfer. She notes that he holds the only voting stock in the company, he spent $750,000 to renovate the Springfield Holiday Inn owned by PMI, he receives a salary from PMI, PMI pays the rent on his New York City apartment, and PMI paid for his car. As to the Exit 6 property, wife states that husband spent $140,000 of marital assets for its purchase.

¶ 16. We find no abuse of discretion. The family court is authorized to equitably divide and assign marital property, and it may consider various statutory factors in making its decision. *Cabot v. Cabot*, 166 Vt. 485, 500, 697 A.2d 644, 654 (1997); 15 V.S.A. § 751. "All property owned by either or both of the parties, however and whenever acquired, [is] subject to the jurisdiction of the court." 15 V.S.A. § 751(a).

The family court may also include as marital assets property that has been placed in other names to avoid distribution to a spouse. *Soutiere v. Soutiere*, 163 Vt. 265, 271, 657 A.2d 206, 209 (1995); see also *Nevitt v. Nevitt*, 155 Vt. 391, 400, 584 A.2d 1134, 1139 (1990) (recognizing that this Court will not condone or give effect to actions "when taken with intent to deprive one's spouse of a fair portion of the marital assets"). On review, we will uphold the family court's findings of fact unless, taking the evidence in the light most favorable to the prevailing party and excluding the effect of modifying evidence, there is no credible evidence in the record to support them. *Semprebon v. Semprebon*, 157 Vt. 209, 214, 596 A.2d 361, 363 (1991).

¶ 17. In this case, the parties agreed that in dividing the marital estate the family court "should not include any order for liquidation of any of the marital assets or invasion even to the extent possible of any of the trust entities."[1] Thus, wife asked the court to include the *value* of the Exit 6 property and the PMI stock in the marital estate, but she did not ask the court to set aside the transfers. Evidently, wife wanted the children to keep the assets and, at the same time, she wanted the full value of the assets to be included in the marital estate. The family court did not abuse its discretion in rejecting this request, which was not only unfair but also contrary to the parties' mutual objective. The parties agreed that the trusts would not be invaded. Thus, by agreement, the children retained ownership of these assets. The assets were therefore not "marital property" subject to distribution by the court.[2] See *Wade v. Wade*, 2005 VT 72, ¶ 10, 178 Vt. 189, 878 A.2d 303 (finding no error in trial court's exclusion of assets in child's trust account from marital estate because funds were child's property and "not part of the marital estate subject to equitable distribution in a divorce proceeding").

¶ 18. To the extent that the family court might have overridden the parties' agreement and ordered that the transfers be rescinded as fraudulent (despite the absence of such a request), the court did not err by failing to do so. Cf. *Clayton v. Clayton*, 153 Vt. 138, 142-43, 569 A.2d 1077, 1080 (1989) (stating that the family court had a duty to consider

---

[1] Although it does not appear that the parties reduced their stipulation to writing, neither party challenges the family court's characterization of their pretrial agreement.

[2] We note that, while the court refused to consider the value of the children's trusts directly as a marital asset in distributing the overall marital estate, it did consider the trusts as a source of possible income to husband to meet his overall obligations.

the bona fides of husband's post-separation transfer of assets in assessing the value of all property interests of each party under 15 V.S.A. § 751(b)(6), and noting that husband was free to present evidence that conveyances were bona fide and not undertaken for the purpose of diminishing the value of the marital estate). Indeed, the family court specifically found that the establishment of the children's trusts, the contributions made to them, and their management, were entirely prudent, and not done with any purpose to deplete the marital estate or defraud wife. The court also found that wife was aware of both the establishment of the trusts and, in general, the transactions taking place with respect to them. These findings are supported by the record.

¶ 19. In asserting that husband transferred these assets with the intent to diminish the marital estate, wife essentially asks this Court to reweigh the evidence and reach a conclusion opposite to that reached by the family court. This we will not do. We defer to the family court's findings because that court is in a unique position to assess the credibility of witnesses and weigh the persuasiveness of the evidence. *Cabot*, 166 Vt. at 497, 697 A.2d at 652. Where, as here, the court's findings are supported by credible evidence in the record, they must stand on appeal. *Semprebon*, 157 Vt. at 214, 596 A.2d at 363. The court acted within its discretion in refusing to include the value of assets owned by the children's trusts as part of the marital estate.

¶ 20. For similar reasons, we also reject wife's assertion that the family court erred by excluding from the marital estate the value of assets held by the Lawrence Kasser Irrevocable Trust. Wife contends that the value of the assets should have been included because husband has control over them, and because the trust was funded with assets that would have been marital property but for the creation of the trust. She notes that husband is the sole beneficiary of the trust, he can invade the principal of the trust for his care and comfort, and he can replace the trustee.

¶ 21. Wife's argument is undermined by the terms of the parties' pretrial agreement. Wife agreed that the family court should not invade the trusts, nor liquidate the parties' assets in dividing the marital estate. Consistent with this stipulation, the family court considered the Lawrence Kasser Irrevocable Trust for the income that it provided to husband, and it did not consider the trust's assets as marital property to be divided. The court did not abuse its discretion in its treatment of this asset.

¶ 22. Wife relies on *Chilkott v. Chilkott*, 158 Vt. 193, 607 A.2d 883 (1992), to support her assertion that the family court should have come up with a creative way to account for the trust's assets in distributing the marital estate. She asserts that husband's interest in the trust is not so remote that it has no ascertainable present value. According to wife, husband's behavior indicates that he treats the trust as his personal savings account.

¶ 23. Wife's reliance on *Chilkott* is misplaced. In *Chilkott*, the husband held a future interest in the income from a trust, contingent on his elderly mother's death, along with a future unrestricted right to invade the principal. The issue in *Chilkott* was not whether the husband's trust interest was marital property, but whether his future interest was so remote that it had no ascertainable present value, or whether its value could be "assessed without excessive speculation." *Id.* at 196, 607 A.2d at 885. In *Chilkott*, the family court relied on uncontradicted evidence to establish the value of the husband's present interest in the trust, and we upheld its finding. *Id.* at 197, 607 A.2d at 885.

¶ 24. In this case, husband does not, and will never have, an unrestricted right to invade the principal of the trust. The children are the beneficiaries of the trust. Husband receives income from the trust, which the court considered in making its award. Had the court included the full value of this asset in the marital estate, husband would have had to account for this asset twice—the principal would have been considered and distributed as part of the marital estate even though the children are entitled to receive the principal. The court did not abuse its discretion in rejecting this approach.

¶ 25. Wife also challenges the court's treatment of a $250,000 promissory note on the Weirton, West Virginia hotel, which she argues was not part of the trust but runs to husband individually. Wife argues that the court ignored the Weirton note, and assigned a negative value to the hotel, which decreased the value of the marital estate by $585,000. We reject this assertion. The court did consider this note for the interest income that it provided to husband. The court explained that the note was a third mortgage on the Weirton property, and it was an existing obligation at the time of the hotel's purchase. Husband purchased the note from the then-holder. The court found that the present value of the note was $221,000, and although it had not been making payments for some time, it was currently making payments of $1000 per month to husband. The court took this asset into account and

did not abuse its discretion in considering it for the income that it provided to husband.

¶ 26. Wife next argues that the court erred in reducing the value of husband's hotel shares by 25%-33% to account for his "minority" ownership status. According to wife, there was no evidence that such a reduction reflected the fair market values of the shares, and all parties testified that the hotel operating agreements required full payment of any withdrawing partner's share. Wife maintains that the court had no information from which to make its judgment that the value of the assets were diminished by 25%-33%.

¶ 27. We disagree. Husband's expert testified that the value of husband's shares was significantly reduced due to his 50% ownership, and the court's reduction was within the range of evidence presented at trial. See *Kanaan v. Kanaan*, 163 Vt. 402, 406-08, 659 A.2d 128, 131-32 (1995) (family court's ability to find a proper valuation is limited by the evidence put on by the parties and the credibility of that evidence). At trial, husband's expert testified to the value of husband's "minority" interest in each property. The expert began by halving the full value that he attributed to each hotel. He then attempted to determine the "real world market-based" valuation of a minority interest. He testified that the marketability for a noncontrolling interest was "significantly diminished," and he questioned whether there was even an active market for minority interests. Husband's position at trial was that his minority interests had no market value, and they were significant only to the extent that they provided him with a revenue stream. Wife argued in support of a 50% reduction of each property's ascertained value, but without an additional reduction to account for the "real world market-based" value of husband's 50% interests.

¶ 28. We have recognized the difficulty inherent in establishing the value of closely held stock. *Goodrich v. Goodrich*, 158 Vt. 587, 590, 613 A.2d 203, 205 (1992). In *Goodrich*, we found that a party's minority interest in a corporation supported a discount in the value of the stock because the shares were not readily marketable and they could not convey a controlling interest in the company. See *id.* at 591, 613 A.2d at 205-06; see also *Cabot*, 166 Vt. at 499, 697 A.2d at 653 (recognizing the difficult task of valuing husband's interest in limited partnership, and stating that "market value of a share in a partnership, like the value of a closely held business, may be difficult to fix precisely"). In this case, the family court received conflicting evidence as to the "real world" value of husband's 50% hotel interests. The court was not swayed by husband's argument that his shares were without value, nor was it

persuaded by wife that the value of husband's interests was simply half of the fair market value of each property. Given the evidence presented at trial, including expert testimony that the value of the shares was "significantly diminished," the court acted within its discretion in reducing the value of husband's interests by 25% to 33% to account for his 50% ownership.

¶ 29. Wife next challenges the court's distribution of the marital assets. She argues that the court abused its discretion because she received only 20% of the marital estate after twenty-three years of marriage. She also complains that she did not receive the marital home.

¶ 30. The family court has broad discretion in dividing marital property, and we will uphold its decision unless its discretion was abused, withheld, or exercised on clearly untenable grounds. *Chilkott*, 158 Vt. at 198, 607 A.2d at 886. The party claiming an abuse of discretion bears the burden of showing that the trial court failed to carry out its duties. *Field v. Field*, 139 Vt. 242, 244, 427 A.2d 350, 352 (1981). We have noted that the distribution of property is not an exact science and, therefore, all that is required is that the distribution be equitable. *Lalumiere v. Lalumiere*, 149 Vt. 469, 471, 544 A.2d 1170, 1172 (1988).

¶ 31. We find the court's award equitable here. The trial court considered the statutory factors in making its award, and it made detailed findings to support its conclusions. The court recognized wife's contribution to the family, but it also found it significant that all of the parties' financial assets had been acquired through husband. See *Wade*, 2005 VT 72, ¶¶ 17-23 (upholding family court's order awarding 90% of marital estate to wife where the court explained in detail why it had attributed great weight to two statutory factors — the party through whom the assets were acquired and the party that had contributed more to their preservation — in arriving at its decision). In this case, the family court was faced with the difficult task of assessing the value of the hotel properties and arriving at a distribution that did not require the liquidation of these holdings or the invasion of the trusts.[3] Although wife argues that she received only 20% of the marital

---

[3] We note that the family court proposed submitting the issues of the valuation of husband's hotel interests as well as a determination of husband's yearly income to a master pursuant to V.R.C.P. 53 and V.R.F.P. 4(a)(1). Husband agreed with this proposal but wife refused. Given wife's refusal, the court could not refer the matter to a master absent a showing that the referral was required by "some exceptional condition" or was otherwise provided for by law. V.R.C.P. 53(b)(2).

assets, it is difficult to determine with precision the exact percentage of assets awarded to each party. As the family court found, the gross value of the marital estate was a flexible number.

¶ 32. In distributing the parties' assets, the court rejected wife's request for an award of $5,000,000 cash in lieu of property. Wife argued, without credible evidence, that the marital estate was worth $10,000,000 and she needed a monthly income stream of $25,000. Wife noted that if the $5,000,000 was paid over a period of ten to fifteen years at a 5% interest rate it would initially yield $20,800 in monthly interest payments, which would leave her a $4200 monthly shortfall in meeting her needs. Wife proposed that the shortfall between the interest and her needs be paid as spousal maintenance.

¶ 33. The court found this request unreasonable and "out of touch with reality" for numerous reasons. It explained that wife's reasonable needs, as measured by the standard of living enjoyed by the parties, did not come close to $25,000 per month. Moreover, the $5,000,000 request for cash in lieu of property was greater than the entire amount of the marital estate as found by the court. The court explained that if $5,000,000 was paid over ten years, that would require principal payments of $500,000 per year, which was entirely beyond husband's means and would totally consume within a short period of time the assets remaining with him. The court also found that, based on husband's $25,000 monthly income and $15,000 in monthly expenses, he was unable to pay wife $25,000 per month, whether through a combination of interest and maintenance, or solely through maintenance.

¶ 34. Rather than adopt wife's unrealistic proposal, and absent a credible figure for wife's reasonable expenses, the court sought to fashion a distribution of the parties' assets in combination with spousal maintenance that would allow wife to maintain a lifestyle commensurate with that established during the marriage while also preserving an income stream to husband that would allow him to meet his obligations to wife, as well as his own established reasonable needs. Pursuant to the court's award, wife received $345,000 in cash, in addition to a $300,000 cash payment, to be paid in ten installments of $30,000 at 6% interest, plus 6% interest accruing on the unpaid balance. At a modest rate of return of 4%, the $345,000 can generate $13,800 in annual interest alone. Wife will also earn 6% interest, or $1800, on each $30,000 yearly installment payment, as well as 6% yearly interest on the unpaid balance of the $300,000 award, which amounts to $16,200 the second year, $14,200 the third year, $12,600 the fourth year, and so on. Wife also received her IRA worth $27,000, a new car worth $40,000,

and she will be named as a beneficiary in husband's life insurance policy.

¶ 35. This case is not like *Dreves v. Dreves*, 160 Vt. 330, 628 A.2d 558 (1993), on which wife relies. In that case, we reversed the family court's property distribution where the wife received 12.5% of the marital assets, and the family court offered no explanation for the disparity in its distribution of the assets. *Id.* at 333-35, 628 A.2d at 560-61. In this case, the court made extensive findings to support its distribution. It acted within its discretion in crafting an award that would preserve husband's income stream, thus allowing him to meet his financial obligations. Given the large cash settlement that wife will receive, as well as the substantial monthly maintenance payments, we find the court's award equitable.

¶ 36. We similarly find no error in the court's decision to award the marital home to husband. The court recognized that the parties sharply disagreed over who should be awarded the home. Husband testified to his long attachment to the property, which he had purchased in 1968, his contribution to improving the property, as well as his greater ability to maintain the property. Husband testified that wife had repeatedly informed him that Vermont was "not for her." Wife asserted that she should receive the property because it had been her home throughout the marriage, and she had made it into a home. The court noted that the parties shared joint custody over their minor child, and there was no particular evidence that the children preferred to return to the marital home with any particular parent. The court also found it likely that wife would leave Vermont in the future. Faced with these competing claims, the court acted within its discretion in awarding husband the marital home, and requiring him to pay wife the full value of the home.

¶ 37. Wife next challenges the court's maintenance award. She asserts that the court abused its discretion because its maintenance award will not allow her to maintain the lifestyle that she enjoyed during the marriage. According to wife, the family court treated her claimed expenses as "ludicrous," while it treated husband's claimed expenses with respect. Wife also suggests that the court erred in determining husband's after-tax income, although she offers little support for this argument.

¶ 38. The court may award maintenance, either rehabilitative or permanent, to a spouse when it finds that the spouse lacks sufficient income, property, or both, including property distributed pursuant to

the divorce decree, to "provide for his or her reasonable needs" and the spouse is unable to support himself or herself "through appropriate employment at the standard of living established during the marriage." 15 V.S.A. § 752(a); *Chaker v. Chaker*, 155 Vt. 20, 24-25, 581 A.2d 737, 740-41 (1990). The maintenance must be in the amount and for the duration the court deems just, based on the consideration of seven nonexclusive factors. 15 V.S.A. § 752(b). Once the family court finds grounds for awarding maintenance, it has broad discretion in determining the duration and amount. *Chaker*, 155 Vt. at 25, 581 A.2d at 740. A maintenance award will be set aside only if there is no reasonable basis to support it. *Id.*

¶ 39. The court's maintenance award was reasonable here. The court considered the statutory factors, and made numerous findings that support its order. As noted above, the court fashioned its distribution of the parties' assets, in combination with its award of spousal maintenance, to allow wife to maintain a lifestyle commensurate with that established during the marriage. The court agreed with the parties that wife should receive a permanent award of spousal maintenance based on the length of the marriage, the age of the parties, wife's limited ability to establish herself in the workplace after many years of foregoing that opportunity by fulfilling her role as a mother, wife, and homemaker, and after considering the marital assets distributed to her.

¶ 40. In determining the appropriate amount of maintenance, the court rejected wife's claimed monthly expenses as grossly exaggerated and found that she had also included items that should not have been included as estimated expenses.[4] Wife stated that she needed $4000 per month for "vacation and travel with the children," for example, which the court found ludicrous. The court concluded that wife's monthly expense statement was more of a "wish list" than a realistic estimate of what her expenses had been or would be in the future. The court noted that, to her credit, wife admitted that her expenses were an "estimate," but, at the same time, she had used these expenses as a basis for her maintenance and property division requests. Thus, the court was put in the position of determining what her reasonable needs were at the lifestyle established by the parties during the marriage, taking into account husband's ability to pay spousal maintenance.

---

[4] In her financial affidavit, dated August 2002, wife claimed monthly expenses of $33,461.

¶ 41. The court concluded that, in light of its distribution of the marital estate and considering the factors set forth in 15 V.S.A. § 752, wife's reasonable needs, in addition to the court's property division, were approximately $6000 per month. The court found that wife currently had no income, other than the temporary spousal maintenance that she had been receiving. Although wife had indicated that she would like to become employed, the court found that, due to the amount of time that she had been out of the workplace and the relatively short time available to her to establish herself, it could not anticipate that her earnings in the future would be substantial.

¶ 42. Turning to husband's income, the court found that the evidence presented a difficult task of determining what husband's actual available income had been in the past and what it would be in the future. The court explained that the vast majority of husband's reported income was "pass through" income, i.e., income that he was required to report for tax purposes but was not necessarily distributed to him. The court found that only rarely had husband received the income from the hotel properties that he had reported on his tax returns, and there was no correlation between each individual hotel property's income and the amount that he might have actually received from that particular property. In light of the difficulty in ascertaining husband's available income from his tax returns, the court relied on husband's testimony, which it found credible, that he regularly received $20,275 in monthly cash distributions from numerous promissory notes, the Springfield Holiday Inn, an investment account, and the Lawrence Kasser Irrevocable Trust. In light of other evidence presented at trial regarding income available to husband, the court found that husband had a regular monthly income of $25,000.

¶ 43. Husband claimed $33,446 in monthly expenses, including approximately $9200 per month in educational and related expenses for the children. The court did not accept all of husband's expenses as reasonably necessary, although it noted that he had been actually paying these expenses. For example, the court found that husband should have excluded a monthly expenditure for income taxes and alimony payments. The court noted that, to husband's credit, he had not included any personal items such as food, clothing, or entertainment in his list of expenses. The court also found that husband had agreed, without objection from wife, to pay for the education of the parties' adult children, even though the court would be considering this as a factor in the distribution of marital assets and the amount of spousal maintenance that would be ordered. Husband had also agreed

to pay the full cost of the minor child's education through college, which the court considered in the income-expense analysis. Based on its findings, the court determined that husband's reasonable personal expenses were $15,000 per month.

¶ 44. Pursuant to the court's order, wife will receive $78,000 per year in spousal support as of July 1, 2003, which increases to $90,000 per year as of July 1, 2006. This represents between approximately 65%-75% of husband's discretionary income of $10,000 per month, after expenses. Husband must maintain a health insurance policy for wife — not an inexpensive proposition. Wife's complaint that she is unable to enjoy the lifestyle that she did during the marriage is largely undermined by her failure to prepare a realistic estimate of her monthly expenses. As the trial court explained, it was forced to make this determination on her behalf. The court's maintenance award, together with its imposition of a 6% interest rate on the $300,000 cash portion of the property distribution, provides wife with an annual income stream of more than $90,000 during the first two years, more than $100,000 during the next three years, and over $90,000 for the five years that follow. This is separate from the other $30,000 per year to be paid over ten years, which was awarded as part of wife's share of the marital estate. Wife will then continue to receive at least $90,000 in maintenance per year. The court found that husband's annual income, after expenses, was reasonably estimated in the range of $120,000. After deducting husband's annual maintenance payments to wife of between $75,000 and $90,000, husband is left with an annual discretionary income of between $45,000 and $30,000. Absent reliable evidence to prove that wife's reasonable expenses, or husband's disposable income, significantly exceeded what was presented, the maintenance award was not patently inequitable.

¶ 45. Finally, wife argues that the court abused its discretion by ordering husband to pay only $20,000 of her remaining expert witness fees. She complains that no evidence was taken on the "reasonableness" of the fees. According to wife, the family court, without any evidence, reduced husband's obligation to one-half of the expert witness fees.

¶ 46. We find this argument without merit. Pursuant to the temporary order, husband was obligated to pay the "reasonable expenses" of wife's expert. The parties agreed to brief the question of the reasonableness of the fees, and they exchanged motions on this issue. The court found that, on its face, the expert's $49,000 bill

appeared excessive, and certain billed items went beyond the stated purpose of the temporary order. The court explained that the expert's presence during the five-day trial was not reasonably necessary. Additionally, it noted that the expert's testimony had not been particularly valuable or, indeed, even accurate. The court stated that husband had already paid over $50,000 in attorneys' fees for wife, as well as over $11,000 in expert witness fees. Based on its findings, the court reasoned that, given the money that wife had had available to her during the divorce proceedings for her purely personal needs, as well as the amount of maintenance and marital assets that she received, and also considering husband's ability to contribute, it was fair that husband bear a portion of the expenses, and that wife pay a portion. The court acted within its discretion in reaching this conclusion.

*Affirmed.*

¶ 47. **Johnson, J.,** dissenting. With all due respect, I cannot join the majority's unquestioning deference to the family court's decision excluding from the marital estate substantial assets that husband transferred to the parties' children shortly before the divorce and awarding wife only about 20% of the devalued assets following a twenty-three-year marriage. I fear that our acquiescence to what occurred in this case may signal to future spouses contemplating divorce that, in the name of estate planning, they can diminish the marital estate by transferring assets to the parties' children on the eve of the divorce without their partner's knowledge or consent.

¶ 48. I would not have this Court usurp the trial court's role by re-weighing the evidence or assessing the credibility of the witnesses. Rather, I believe that the undisputed facts of this case required the family court to include as part of the marital estate those assets that husband transferred in trust to the parties' children immediately before and during the divorce proceedings. Cf. *Klockow v. Klockow*, 979 S.W.2d 482, 488 (Mo. Ct. App. 1998) (party claiming property is nonmarital bears burden of proving contention by clear and convincing evidence). I also believe that the court failed to adequately explain why other trust assets in which husband retained a controlling interest were not included in the marital estate. Finally, I find no evidence to support the family court's one-third reduction in the value of husband's 50% interest in several hotel properties based on his "minority" interest in the properties. I would vacate the family court's property distribution and maintenance award and remand the case for the court

to reconsider those matters after taking into account the entire marital estate.

## I.

### A.

¶ 49. There are two substantial assets in particular that the family court chose not to include as part of the marital estate. The first is 99% of the stock in Preferred Motor Inns of New England, the corporation that owns, among other properties, the Springfield Holiday Inn, which husband's expert valued at $1.4 million at the time of the final divorce hearing. Husband purchased the Springfield Holiday Inn in 1994 after having received $1.4 million from the sale of his father's business in 1988 and a $750,000 trust fund upon his father's death in 1991. Later, husband set up Preferred Motor Inns to own and operate the Springfield Holiday Inn and other properties. In 1998, after the parties began to contemplate divorce, husband communicated with his Boston attorney about the possibility of transferring ownership of Preferred Motor Inns to the Crummey Trusts, which husband had established years earlier to provide for the parties' children.

¶ 50. In January 1999, approximately one month before he filed for divorce, husband transferred 99% of the stock of Preferred Motor Inns to the Crummey Trusts. He retained the remaining 1% — the only voting stock — which allowed him to control use of the funds to support his business interests. At the same time, husband transferred the Exit 6 property to the Crummey Trusts at a supposed value of $60,000 — the same amount allowed annually for three children under Internal Revenue Service regulations — even though he had purchased the property for $140,000. Later, while the divorce action was pending, husband spent $750,000 in marital assets to upgrade·the Springfield Holiday Inn that he had transferred to the children's Crummey Trusts.

¶ 51. Notwithstanding the timing of the transfers with respect to the parties' impending divorce, the family court decided not to include the value of these assets as part of the marital estate based on its finding that husband had made the transfers for the purpose of prudent estate planning and not to deplete the marital estate. Given the facts of this case, I would hold that the court abused its discretion by excluding the assets that husband transferred from the marital estate on the eve of the parties' divorce. Regardless of husband's stated intent, when one spouse transfers substantial assets from the marital estate immediately before an impending divorce without the consent of the other spouse and outside the pattern of previous financial transfers, the

family court should include the transferred assets as part of the marital estate. Under such circumstances, there is no reason for the family court to have to divine the intent of the party who divested the marital estate of funds. Because the family court ultimately decides how to allocate the marital assets between the parties, the court should include all property that is fairly in the marital estate and then state its reasons for the allocation, keeping in mind the relevant statutory criteria. See 15 V.S.A. § 751(a) ("All property owned by either or both of the parties, however and whenever acquired, shall be subject to the jurisdiction of the court.").

¶ 52. A case on point is *In re Marriage of Lee*, 615 N.E.2d 1314 (Ill. App. Ct. 1993). There, the husband transferred over $250,000 into a trust for the parties' children in the three months preceding the parties' separation. The appellate court upheld the trial court's decision to include the transferred funds as part of the marital estate, noting that the amount transferred shortly before the parties' separation greatly exceeded the previous annual transfers of $10,000 per child into the trust, and that the husband did not inform the wife of the transfers. *Id.* at 1320. Noting further that "the expenditure did not benefit the joint marital enterprise," the court rejected the husband's argument that the transfers represented his taking advantage of a "rare opportunity" to benefit the children. *Id.* Compare *Thames v. Thames*, 477 N.W.2d 496, 498-99 (Mich. Ct. App. 1991) (upholding trial court's inclusion as part of marital estate stock that husband transferred into irrevocable trust for benefit of parties' minor child one month before filing for divorce), with *Sanders v. Sanders*, 902 P.2d 310, 317 (Alaska 1995) (upholding trial court's exclusion of limited entry fishing permit from marital estate based on finding that wife had consented to husband's transfer of permit to husband's children).

¶ 53. Like his counterpart in *Lee*, husband transferred substantial marital assets to the parties' children shortly before and during the divorce without informing wife, even though the transfers were out of line with husband's previous history of giving $60,000 per year to the three children — the tax-free limit under IRS regulations. Indeed, never before had husband transferred to the children's trusts assets anywhere near the amount that he transferred to the children shortly before the parties' divorce. Similarly to *Lee*, husband and his trustee characterized the large predivorce transfers as a "brilliant" piece of estate planning aimed at taking advantage of new tax laws.

¶ 54. The family court accepted this explanation, focusing exclusively on whether the transfers represented good estate planning. Rather

than considering the nature or timing of the transfers, or the effect of the transfers on the value of the marital estate, the court simply noted that the transfers were prudent financial investments that not only benefitted the children, but also allowed husband to maintain a stream of income, which, in turn, indirectly benefitted wife by increasing the amount of income husband had available to provide maintenance to her. The majority also accepts this reasoning, repeating the family court's finding that husband's transfer of assets to his children shortly before the parties' divorce was undertaken with the intent of wisely providing for the children's future while, at the same time, preserving a source of income and borrowing.

¶ 55. A spouse should not be able to "use a claim of 'estate planning' and unilaterally distribute marital assets to defeat another spouse's equitable distribution claim." *Nagle v. Nagle*, 799 A.2d 812, 822 (Pa. Super. Ct. 2002) (Del Sole, P.J., concurring in part and dissenting in part) (agreeing with majority that spouse should not be able to transfer marital assets in name of estate planning without explaining other spouse's potential interest in plan); see *Soutiere v. Soutiere*, 163 Vt. 265, 271, 657 A.2d 206, 209 (1995) (citing line of cases "giving family court judges the power to include within marital assets property which has been placed in other names to avoid distribution to a spouse"). Husband's claim that he was taking advantage of tax laws to benefit his children should not allow him to diminish the marital estate on the eve of the parties' divorce under the guise of estate planning. See *Lee*, 615 N.E.2d at 1319 ("A transfer of marital assets does not escape classification as dissipation merely because it is to, or for, the benefit of children of the marriage."). Otherwise, nothing would prevent any future spouse from making "prudent" financial transfers that diminish the marital estate. As the *Lee* court stated, "to allow spouses to make transfers of marital assets which automatically escape dissipation treatment if made to the parties' children invites vindictive spouses to make such transfers for the primary purpose of depriving the other spouse of the use of his or her fair share of the marital estate." *Id.* at 1320.

¶ 56. In upholding the family court's decision not to include the Preferred Motor Inns stock as part of the marital estate, the majority relies upon the court's finding that, to the extent possible, the parties did not want the marital assets liquidated or the trusts invaded. The majority refers to a brief exchange in which, at her attorney's prompting, wife agreed that she wanted the trust assets that husband transferred to the children included as part of the marital estate, "but that

the transactions not necessarily be set aside." According to the majority, mother unfairly wanted the assets counted twice.

¶ 57. In my view, the majority makes too much of wife's lone response and fails to consider the context in which it was made. Wife's comment arose during her testimony concerning her expenses. Wife asked the court to give her enough money to allow her to make an annual donation to the children's trust accounts equal to that of husband. She attempted to explain how husband's control over the money available to the parties' children made her feel devalued and undermined her relationship with the children. In this context, she initially stated that she wanted the trust transfers set aside, but then, at her attorney's prompting, agreed that, although she wanted the trust assets included in the marital estate, she did not *necessarily* want the transactions set aside.

¶ 58. Wife's comment is understandable. By transferring substantial marital assets into the children's trusts shortly before the divorce, husband placed wife in the unenviable position of having to decide whether to oppose the transfer of assets to her own children. Like husband, wife wanted to provide for the children, as she had done during the parties' lengthy marriage. Having been an equal partner during the marriage, wife wanted only to continue to be an equal provider for the children following the parties' divorce. Instead, she felt that her contributions during the marriage had been devalued by husband's control over the marital assets, including those assets that he transferred to the children's trusts shortly before the divorce.

¶ 59. The majority is correct that the marital assets cannot be counted twice, but wife stated only that she did not necessarily want the trust transfers set aside. By making this single comment, wife did not waive her request to treat the trust assets as part of the marital estate. Both the majority and husband repeatedly refer to the parties' agreement on how to treat the trust assets, but apparently there was no written agreement. Indeed, husband cites the record only once concerning any agreement between the parties. There, his trial attorney states merely that he and wife "both agree that however the Court looks at this[,] liquidation or for sale is not the way to arrive at where you're going." On the other hand, in her proposed findings, wife asked the family court to find that husband had fraudulently transferred marital assets to the children's trusts shortly before the divorce. Under these circumstances, the court should have included those assets as part of the marital estate.

B.

¶ 60. The second major asset that the family court excluded from the marital estate is the Lawrence Kasser Irrevocable Trust of 1992. As noted, the $750,000 trust fund became part of the marital estate after husband's father died in 1991. Its value increased to $850,000 by the time of the final divorce hearing. The court considered the trust only as a source of income for husband and not as part of the marital estate based on its finding that husband had no right to invade the principal of the trust. Yet, the court also found that husband has a limited right to invade the principal of the trust and that he has the power to appoint or replace the trustee. The court did not explain the nature of husband's limited right to invade the trust, but one of the trust provisions allows husband to use as much of the trust as the trustee deems appropriate for husband's "welfare, comfort, and support" as long as husband's physician certifies him to be "disabled in any manner." Nevertheless, the court was reassured that husband would not invade the principal for his own benefit because a prudent fiduciary would not do so unless there was dire need, and that was not likely here.

¶ 61. Unlike the majority, I cannot accept the family court's reasoning. To the extent that the court relies on its finding that husband cannot invade the principal of the trust, that finding is clearly erroneous and inconsistent with the trust document and another court finding that husband has a limited right to invade the principal of the trust. Further, regardless of what husband or a prudent advisor might do, the point is that husband has the power, if he so chooses, to replace the trustee and invade the principal of the trust. Therefore, husband has control over the trust, and there is no reason to exclude it from the marital estate.

¶ 62. The family court repeatedly states, and the majority apparently agrees, that certain interests of husband's are being accounted for as a source of income rather than part of the marital estate. Husband encourages this approach, asserting that the parties agreed not to liquidate his hotel interests or invade the various trusts so that his income stream could be preserved. But any agreement the parties had that husband not be required to liquidate his hotel interests or invade the income-producing trusts is not the same as stipulating that the family court need not include those assets in the marital estate in determining an equitable property division. Wife may not want the marital estate liquidated, but she is entitled to have all of it counted. Even if the parties' financial circumstances prevented the family court from ordering an immediate lump-sum payment representing wife's

share of the marital estate, wife is still entitled to a full accounting, and an equitable division, of the value of the entire marital estate. Cf. *Cabot v. Cabot*, 166 Vt. 485, 496, 499, 697 A.2d 644, 651, 653 (1997) (court acted within its discretion by awarding wife $1.5 million but no maintenance following twelve-year marriage in which major asset was husband's $4 million investment account).

## II.

¶ 63. The trial court not only failed to include substantial assets in the marital estate, but also reduced the value of the remaining seven hotel properties because of husband's "minority" interest in those properties. In fact, husband's interest is *not* a true minority interest; rather, it is a 50% share. Husband's expert estimated one-half of the value of those seven properties to be approximately $3 million, far below the value placed on the properties by wife's expert. The court found husband's expert to be more credible, and wife does not contest his valuation. She does challenge, however, the family court's further reduction of that value based on husband's "minority" interest in the properties. Husband actually testified that because he did not own controlling shares of the properties, nobody would buy his shares and, therefore, their aggregate fair market value was zero. Husband's expert suggested that the investment community's interest in a noncontrolling share of hotel properties would be "significantly diminished," but conceded that he had "not taken this to another level of determining what, if any, that discount would be ... because the empirical data to determine a discount on a minority interest in hotels of this type is virtually impossible to find."

¶ 64. Based on this evidence alone — husband's valuation at zero and his expert's valuation at $3 million minus an indeterminable "discount" — the family court further reduced the value of husband's 50% hotel interests by $1 million. In my view, the testimony of husband's expert is so vague and uncertain as to any "discount" that it cannot support the court's $1 million reduction in the value of the hotels. Furthermore, even if I accepted, for the sake of argument, that husband's interest is a minority interest, his expert presented no figures or method for calculating any discounted value. Rather, after speculating that investors would have a limited interest in a minority share of the hotel properties, the expert acknowledged that there is no empirical evidence from which to discount the value of hotel properties based on a minority interest.

¶ 65. The situation here is not comparable to *Goodrich v. Goodrich*, 158 Vt. 587, 613 A.2d 203 (1992), the case upon which the majority relies. *Ante*, ¶ 28. In that case, we held that the trial court did not err in discounting the face value of the wife's 5% share of a company founded by her great-grandfather because the stock was not readily marketable and the record did not reflect any special rights or powers attending the minority interest. *Id.* at 591, 613 A.2d at 205-06. In rejecting the husband's argument concerning the value of his wife's minority interest, we cited the "small percentage of the outstanding stock, coupled with no apparent power to affect the management of the company." *Id.* at 592, 613 A.2d at 206. We also distinguished the case that the husband relied on therein, noting that it concerned a spouse who was one of three founders of the business and held 22% of the business's stock. *Id.*

¶ 66. Here, husband owned a full 50% of the hotel properties — an interest equal to all other interests combined. Further, the evidence was undisputed that the hotel operating agreements contained provisions establishing a mechanism under which the partners would buy out each other based on the full value of the entire business as a going concern. In light of these circumstances, the family court's further devaluing of husband's interest in his hotel properties based on his "minority" interest was clearly erroneous.

¶ 67. This is not, as the majority concludes, a decision within "the range of evidence." *Ante*, ¶ 27; see *Kanaan v. Kanaan*, 163 Vt. 402, 407-08, 659 A.2d 128, 132 (1995) (trial court's valuation of closely held business may be upheld if it is within range of evidence). Aside from husband's incredible statement that his 50% interest in seven hotels is worth zero, the only other evidence was husband's expert surmising that investors would not be willing to pay full value, but acknowledging that he had no methodology to devalue husband's interest in the hotels based on his 50% ownership. In short, far from being within the "range of evidence," there is no evidence.

### III.

¶ 68. Putting aside the assets that the trial court excluded from the marital estate, wife still received only slightly more than 20% of the estate following a twenty-three-year marriage in which she served as a homemaker for her family while husband built up his businesses. If the trial court had included all of the marital assets, as outlined above, and credibly justified in a written decision a 20% share to wife, there might be no grounds to disturb the court's decision. But when wife receives

only 20% of an estate that has already been greatly reduced by excluding substantial assets, I cannot find the property division equitable.

¶ 69. It is difficult to discern from the family court's decision why wife received such a small part of the reduced marital estate, although the court stated that it considered 15 V.S.A. § 751(b)(10) — "the party through whom the property was acquired" — to be a major factor in its property division. By way of explanation, the court briefly noted that the parties' assets did not begin to accumulate rapidly until after 1988, when husband's father gave husband $1.4 million from the sale of the father's businesses, including a business that husband had started in the early 1970's while working for his father before the parties were married.

¶ 70. I believe that the family court abused its discretion by making this factor so significant that wife received only 20% of the marital assets. "Although § 751(b)(10) allows the court to give weight to 'the party through whom the property was acquired,' there are limits to the court's discretion." *Dreves v. Dreves*, 160 Vt. 330, 334, 628 A.2d 558, 560 (1993); see 15 V.S.A. § 751(a) ("property owned by either or both of the parties, however and whenever acquired" is subject to family court's jurisdiction). In *Dreves*, we reversed the family court's decision to give the wife only 12.5% of the parties' assets, finding insufficient the court's explanation that the marriage was fairly short (six years) and nearly all of the assets were originally attributable to the husband. *Id.* at 335, 628 A.2d at 561.

¶ 71. Here, the parties were married for twenty-three years. While husband built up his businesses, wife was a homemaker for him and the parties' three children. Although the financial resources that provided the capital for husband to expand his businesses came from his family, he obtained those resources long before the parties divorced, and he used them during the lengthy marriage while wife supported him in his endeavors. Indeed, the major asset — the $1.4 million from the sale of his father's businesses — came into the marriage in 1988, the same year that the parties' third child was born, and fifteen years before the family court's final divorce order. Under these circumstances, the original source of the income, although a relevant factor, is less significant than it would have been had this been a short-term marriage.

¶ 72. This case can be compared to *Hanaway v. Hanaway*, 527 N.W.2d 792 (Mich. Ct. App. 1995), in which the wife argued that the trial court erred by failing to include as a marital asset stock in the

husband's family business, resulting in her receiving only 20% of the marital estate. In rejecting the trial court's reasoning that wife had not contributed to the acquisition and growth of the business, the appellate court stated as follows:

> The business clearly prospered during the marriage. While the source of [husband's] interest in the company was his father's annual gifts of stock, the financial yield over time from that interest and the increased value of that interest necessarily reflected [husband's] investment of time and effort in maintaining and increasing the business, an investment that was facilitated by [wife's] long-term commitment to remain at home to run the household and care for the children.
>
> Although initially given to [husband] by his father, the interest in the business was a major asset of the marriage that [husband] was permitted to cultivate and nurture over the years. It is inequitable to deprive [wife] of any share of the business or its value on the basis that she enjoyed the benefits of [husband's] salary over the years. The fruits of [husband's] efforts in the business were both the increase in the value of the business since 1968 and the salary he drew over the years. The parties were building an asset as well as enjoying its fruits on an ongoing basis. That [wife's] contribution to the asset came in the form of household and family services is irrelevant.

*Id.* at 799-800.

¶ 73. The same can be said in the instant case. While acknowledging that wife made a significant, nonmonetary contribution to the parties' marriage, the family court does not appear to have fully compensated her for that contribution. Even with its exclusions and reductions in the marital estate, the court gave wife only about $650,000 out of $3.2 million, or just over 20%. The record and the relevant statutory criteria do not support such a one-sided property distribution.

¶ 74. The family court also awarded wife maintenance starting at $5500 per month and reaching $7500 per month by July 2006 based on its conclusion that husband's income was $300,000 per year and wife's was zero. Factoring in the court's findings that husband had expenses of $180,000 per year, and wife had expenses of $72,000 per year, wife's maintenance award represents between $6,000 below and $18,000 above her expenses, while husband is left with substantial income above and beyond his expenses. Thus, wife will most likely be forced to

use some of her property distribution to pay for part of her living expenses. Meanwhile, a significant portion of husband's expenses are educational costs that will end in the next few years and that could have been paid out of the children's trust funds.

¶ 75. Moreover, husband has substantial reported income above the $300,000 that the family court calculated in making its maintenance award. Since the middle to late nineties, husband's tax returns have indicated an adjusted gross income of over $500,000 per year. For purposes of determining an appropriate maintenance award, however, the family court concluded that husband had a yearly income of only $300,000, noting that much of the income he reported to the IRS was pass-through income that was reinvested in his properties rather than distributed directly to him. I do not quarrel with the family court's finding that much of husband's income was not distributed to him, but it is still income to husband. That he chooses to reinvest it in his companies to increase the value of his assets is an investment choice on his part. Yet the trial court inexplicably failed to recognize that this income is increasing husband's earning power and assets, some of which were excluded from the marital estate.

## IV.

¶ 76. Considering all of these facts, I cannot agree with the majority that the family court's property division and maintenance award are equitable. The majority recites at length how much money wife will receive under the family court's order. The issue, however, is not whether wife will be able to live comfortably on assets awarded to her by the court, but rather whether she obtained a fair share of the parties' substantial assets, given all of the relevant factors, including the length of the marriage, her role during the marriage, and the parties' standard of living during the marriage. The record plainly demonstrates that the family court awarded wife a very small percentage of the parties' assets following a lengthy marriage in which she raised the parties' children. I recognize that wife most likely will never be in financial need, but, the fact remains, she did not receive her fair share of the parties' large estate.

¶ 77. I also recognize that this was a very difficult case to try because husband's financial investments are quite complicated. But as long as parties with large and complicated marital estates invoke the jurisdiction of the family court to divide their property, the court must be up to the task. In hindsight, notwithstanding that the parties hired their own

experts, this case should have been referred to a master at the expense of the parties, and could be so referred on remand.[5]

¶ 78. My primary concern, however, is that the majority is creating a precedent that allows one spouse to unilaterally divert significant marital assets to the parties' children and thus diminish the marital estate on the eve of a divorce in the name of estate planning. This is particularly troubling because we need not create such a precedent nor burden the family court with the impossible task of divining the motives of parties who have every incentive to defeat the interests of their spouses. I would hold that the family court abused its discretion in this case by: (1) excluding from the marital estate the significant assets that husband transferred into the children's trusts shortly before and during the divorce proceedings; (2) excluding the large trust that he controlled for himself and the children's benefit; and (3) reducing the value of husband's 50% interest in his hotel properties based on an illusory "minority" ownership that even his own expert could not value. Particular circumstances and characteristics concerning the parties' assets may affect how those assets are distributed between husband and wife, but however they are eventually distributed, they must be recognized for what they are — marital assets. I would remand the matter for the court to reconsider its property division and maintenance award after taking into account the entire marital estate and all of the relevant statutory criteria.

¶ 79. I am authorized to state that Justice Skoglund joins in this dissent.

---

[5] The majority notes that wife objected to the family court's proposal to allow a master to value husband's hotel interests and determine his yearly income. In my view, the court should have referred those factual determinations to a master despite wife's objection, given the exceptional situation created by husband's complicated financial dealings. Moreover, even if the complexity of husband's finances could not be considered an "exceptional condition," a master's role in this situation would be more analogous to that of an accountant as opposed to a decision maker. See V.R.C.P. 53(b)(2) ("[I]n an action to be tried without a jury, save in matters of account, a reference shall be made only upon a showing that some exceptional condition requires it or when provided by law.").