### Daniel M. Renaud v. Gail E. Renaud

[721 A.2d 463]

No. 97-366

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed September 11, 1998

*Jan E. Bernasconi* of *Paul, Frank & Collins, Inc.*, Burlington, for Plaintiff-Appellant.

*Sandra M. Lee* of *Keiner & Dumont, P.C.*, Middlebury, for Defendant-Appellee.

**Johnson, J.** Daniel Renaud (father) appeals from a divorce judgment of the Franklin Family Court. He contends the court: (1) abused its discretion in awarding Gail Renaud (mother) sole legal and physical parental rights and responsibilities notwithstanding the court's finding that mother had interfered with the relationship between the child and father; and (2) erroneously divided the marital estate. We affirm.

The parties were married in October 1989. They had one child, a son, born in January 1994. In May 1996, the parties separated following father's disclosure that he was having an affair with a co-worker and wanted a divorce. At the time of trial in April and May of 1997, mother was living with the three-year-old child in the marital home, and father was living with the co-worker and her children.

Both parties worked full time in supervisory positions for the federal government. Before the separation, both shared in attending to the minor's childcare needs. Mother arranged her work schedule to have Fridays off to spend with the child. Father took the child to daycare in the morning, visited him there during the day, and brought him home at night. Mother generally took time off from work when the child was sick, purchased his clothes, and did his laundry. The

court found that both parents provided the child with love, discipline, structure, and guidance, and that either would be fit to serve as the custodial parent.

Following the separation, father voluntarily moved out, and mother and child continued to reside in the family home. Almost immediately, mother began to impede father's contact with the child, forcing father to file a number of motions to establish an emergency visitation schedule. Following a hearing in July 1996, the court established a temporary visitation schedule. Thereafter, mother filed a succession of relief-from-abuse petitions, alleging that father had physically and sexually abused the minor. The allegations ranged from evidence of diaper rash, to sunburn, cuts and bruises, and inappropriate touching. These petitions further disrupted father's contact with the child, resulting in periods of noncontact and supervised visitation.

None of the abuse allegations was substantiated, and all of the petitions were ultimately dismissed. Indeed, the court found that father had never abused the minor, that the factual support for the "excessive number of motions and petitions" was "weak at best," and that mother had, in fact, "imagined abuse where there was no abuse." The court further found that mother's actions were the result of a heightened distrust of father because of his marital unfaithfulness, and that her "baseless suspicions ha[d] adversely affected [the minor] in that he is no longer as loving towards [father] as he once was." A team of psychiatric experts appointed by the court observed that the child interacted well with each parent, but noted that mother's repeated accusations had damaged the child's relationship with father, and warned that if such accusations continued they could seriously compromise the father-child relationship.

The court awarded sole parental rights and responsibilities to mother, albeit "with some hesitation." The court found that the child had an extremely close emotional relationship with mother and that "upsetting that relationship [was] likely to be detrimental to [the child]." The court further observed that mother had sought counseling to overcome her emotional problems resulting from the divorce, and concluded that she would be able "in a reasonable period of time . . . [to] help repair the damage she caused to the relationship between [father] and [the child]," and could "actively encourage frequent and open contact" between them. To further ensure that this occurred, the court specifically ordered mother to encourage the child to develop a warm and loving relationship with father, forbade either parent from making disparaging remarks about the other in the

minor's presence, and ordered extensive visitation with father totalling about fifty percent of the minor's time. This appeal followed.

## I.

In light of the court's express findings that mother had undermined the child's relationship with father by filing excessive and baseless abuse allegations, father contends that the court's decision to award mother sole parental rights and responsibilities was a patent abuse of discretion. Like the trial court here, we are reluctant to condone any conduct by a parent that tends to diminish the child's relationship with the other parent. Indeed, in awarding parental rights and responsibilities, the court is statutorily required to consider "the ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the other parent, including physical contact, except where contact will result in harm to the child or to a parent." 15 V.S.A. § 665(b)(5). Across the country, the great weight of authority holds that conduct by one parent that tends to alienate the child's affections from the other is so inimical to the child's welfare as to be grounds for a denial of custody to, or a change of custody from, the parent guilty of such conduct. See generally Annotation, *Alienation of Child's Affections as Affecting Custody Award*, 32 A.L.R.2d 1005 (1953) (collecting cases).

The paramount consideration in any custody decision, however, is the best interests of the child. See *Bissonette v. Gambrel*, 152 Vt. 67, 70, 564 A.2d 600, 602 (1989); *Lafko v. Lafko*, 127 Vt. 609, 618, 256 A.2d 166, 172 (1969). Children are not responsible for the misconduct of their parents toward each other, and will not be uprooted from their home merely to punish a wayward parent. See *Nickerson v. Nickerson*, 158 Vt. 85, 90, 605 A.2d 1331, 1334 (1992) (attention should be directed to needs of the children rather than actions of parents). Nevertheless, a child's best interests are plainly furthered by nurturing the child's relationship with *both* parents, and a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent. See *Young v. Young*, 628 N.Y.S.2d 957, 958 (App. Div. 1995) (interference with relationship between child and noncustodial parent raises "'a strong probability that the offending party is unfit to act as a custodial parent'") (quoting *Maloney v. Maloney*, 617 N.Y.S.2d 190, 191 (App. Div. 1994)); see also *McAdams v. McAdams*, 530 N.W.2d 647, 650 (N.D. 1995) ("[A] parent who willfully alienates a child from the other parent may not be awarded custody based on that alienation.").

This is not to say that evidence of alienation of affection automatically precludes the offending parent from obtaining custody. See *Slinkard v. Slinkard*, 589 S.W.2d 635, 636 (Mo. Ct. App. 1979) ("[A]lthough alienation of a child's affections from his natural parent and interference with visitations rights may be grounds for change of . . . custody, they do not compel such a result."). The best interests of the child remains the paramount consideration. Courts should be wary, however, of over-reliance on such otherwise significant considerations as the child's emotional attachment to, or expressed preference for, the offending parent, or on such factors as stability and continuity. For as one court has observed, "The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children." *Nehra v. Uhlar*, 372 N.E.2d 4, 7 (N.Y. 1977). And although stability is undoubtedly important, the short-term disruption occasioned by a change of custody may be more than compensated by the long-term benefits of a healthy relationship with both parents.

Thus, where the evidence discloses a continual and unmitigated course of conduct by a parent designed to poison a child's relationship with the other parent, a change of custody from the offending parent may well be in the child's long-term best interests. See *Begins v. Begins*, 168 Vt. 298, 303, 721 A.2d 469, 473 (1998) (court abused its discretion in awarding custody to father where single most significant factor contributing to sons' estrangement from mother was constant poisoning of relationship by father); see also *Lewin v. Lewin*, 231 Cal. Rptr. 433, 437 n.4 (Ct. App. 1986) (change of custody compelled where mother engaged in ongoing conduct intended and designed to interfere with development of healthy father-daughter relationship); *Thurman v. Thurman*, 245 P.2d 810, 815 (Idaho 1952) (trial court abused discretion in refusing to award custody to mother where father had "by design and planning" interfered with mother's visitation rights); *In re Leyda*, 355 N.W.2d 862, 866 (Iowa 1984) (trial court abused discretion in awarding custody to mother where evidence disclosed that she had "sought to obscenely denigrate and deny the emotional relationship between [the child] and her father").

A more subtle, but no less invidious, form of interference in parent-child relations may take the form of persistent allegations of physical or sexual abuse. In *Young*, for example, the court reversed an award of custody to the mother where the trial court had inexplicably ignored uncontradicted evidence that the mother had filed numerous

false accusations of sexual abuse by the father. As the court observed, "[t]hese repeated uncorroborated and unfounded allegations of sexual abuse brought by the mother against the father cast serious doubt upon her fitness to be the custodial parent." 628 N.Y.S.2d at 962. Other decisions are to similar effect. See, e.g., *Lewin*, 231 Cal. Rptr. at 437 n.4 (change of custody compelled where mother had "made numerous bizarre, outrageous and totally unfounded accusations" of child abuse against father); *In re Wedemeyer*, 475 N.W.2d 657, 659 (Iowa Ct. App. 1991) (upholding change of custody where mother's "flagrant and continuing destructive conduct," including persistent allegations that father was "an insane sex addict who masturbates and performs sexual acts with animals," had interfered with children's association with father); *Ellis v. Ellis*, 747 S.W.2d 711, 715 (Mo. Ct. App. 1988) (change of custody justified where mother had "used the device of making a false accusation of sexual abuse against [father] as a weapon to cut off his access to [the child]").

The situation is more difficult where the allegations of abuse, although ultimately found to be baseless, may initially be in doubt. Society has a strong interest in encouraging parents to take action if they suspect that their child is being abused. Accordingly, courts should infer an ulterior motive in the filing of such charges only where a parent knew, or reasonably should have known, that they were groundless. Here, the court found that the factual support for mother's relief-from-abuse petitions was "weak at best," and that mother "imagined abuse where there was no abuse" because of her emotional distress and distrust of husband. The record amply supports these findings, but the findings do not indicate whether mother knew or reasonably should have known that the petitions were groundless.

The record mitigates in favor of mother in this regard. The evidence showed that she did not act precipitously in filing the petitions, but consulted with the child's pediatrician and therapist, as well as her own therapist, about her suspicions. The child's pediatrician recalled at the first relief-from-abuse hearing that mother had expressed grave concern that father was neglecting the child's physical well-being, and did not appear to be acting out of malice or spite. Moreover, while he informed her that the child's physical condition did not necessarily suggest abuse or neglect, he also told her that if the child's sunburns continued he would "be quite alarmed," and would feel that the "caregiver [father] is not able to protect [the child] from an obvious source of harm." Although the

court ultimately dismissed the petition, finding no evidence of abuse, it did express concern about the sunburn and bruises, and urged father to "redouble [his] efforts to be vigilant."

Mother also expressed her concerns to the child's therapist. She was particularly anxious about statements by the child suggesting that father had manipulated the child's penis. The therapist recalled at the second relief-from-abuse hearing that mother "chiefly wanted guidance." Although he ultimately concluded that it was unlikely the child had been abused, he was sufficiently concerned to contact Social and Rehabilitation Services. Later, when mother informed him that she had filed a relief-from-abuse petition, the therapist reassured her that he would have done the same under the circumstances. Although the court again found the allegations of abuse to be groundless, it stressed that it was "not at all suggesting that the mother's reaction wasn't appropriate. She was obviously concerned. She was obviously worried. But we don't find anyting devious about what she did here . . . basically as a concerned mother under the circumstances."

Mother's therapist also contacted SRS on mother's behalf after hearing her concerns. Like the pediatrician and the child's therapist, he believed that mother was primarily seeking expert guidance and reassurance that the child was being well cared for.

Thus, the record evidence does not support a finding that mother's purpose was to alienate the child from his father, or that her concerns were wholly unreasonable. It is particularly significant in this regard that mother repeatedly sought expert guidance before acting and received ambiguous messages, suggesting on the one hand that the physical evidence of abuse was weak, but on the other hand that her concerns were not entirely unfounded and certainly warranted investigation.

The trial court also focused on the relatively transient nature of mother's emotional distress, finding it "likely that, in a reasonable period of time, [mother] will be less distrustful of [father] and will help repair the damage she caused to the relationship between [father and child]." Although there was conflicting evidence on this point, substantial credible expert evidence supported the conclusion that mother's actions were a transient reaction to a highly volatile emotional situation, and that she had progressed to the point where she could within a reasonable period of time cooperate with father and foster a healthy relationship with the child. We note that the child's tender years may facilitate the healing process envisioned by the court, whereas an older child might not be so amenable to change.

Indeed, the evidence and the findings here contrast sharply with those in another case decided today, *Begins*, 168 Vt. at 303, 721 A.2d at 473. There, the family court awarded the father parental rights and responsibilities for two teenage boys, notwithstanding its express finding that the father had willfully poisoned the mother's relationship with the boys and had demonstrated no inclination to act otherwise. The court had also found that the mother had been the children's primary care provider before the separation, and was the custodian of choice in all other significant respects. We thus concluded that an award to the father in these circumstances would seriously impede the mother's opportunity to reestablish a healthy relationship with her sons in the future, and that reversal of the judgment was compelled. *Id.* Here, in contrast, the court expressly found that mother's actions were transitory, unlikely to be repeated, and subject to cure.

Finally, we note that the court awarded father extremely liberal visitation, resulting in a nearly equal sharing of time with the child. This fact, coupled with the court's finding that a change of custody would be highly detrimental to the minor, and that mother would be able to foster a healthy relationship with father within a reasonable period of time, leads us to conclude that the court did not abuse its discretion in awarding parental rights and responsibilities to mother. We hasten to remind the parties, however, that the court's ruling is subject to future modification, and underscore the court's specific admonishment to mother to encourage a warm and loving relationship between father and child.

## II.

Father additionally contends the court abused its discretion in awarding mother a substantially greater share of the marital estate. Specifically, he argues that the evidence failed to support the court's finding that mother's future income was likely to be less than father's; that the court failed to consider wife's future proceeds from a personal injury claim; and that the court placed undue emphasis on marital fault.

"We have repeatedly held that the 'disposition of property pursuant to a divorce decree is a matter of wide discretion for the trial court.'" *Milligan v. Milligan*, 158 Vt. 436, 439, 613 A.2d 1281, 1283 (1992) (quoting *Lalumiere v. Lalumiere*, 149 Vt. 469, 471, 544 A.2d 1170, 1172 (1988)). We will not disturb that disposition unless the court's

discretion was abused, witheld, or exercised on clearly untenable grounds. See *id.* Where reasonable evidence supports the court's findings and conclusions, they must be affirmed. See *Johnson v. Johnson*, 155 Vt. 36, 43, 580 A.2d 503, 507 (1990).

We have reviewed the record and conclude that it amply supports the court's finding that father's income will increasingly outstrip mother's in future years. The court also correctly declined to consider any potential damages from a car accident that occurred subsequent to the parties' separation, noting that the value of the claim was unknown, and that any damages awarded would be used to compensate mother for her losses. These findings were supported by the record evidence, and thus may not be disturbed on appeal. See *id.* Finally, father's claim that the court placed undue emphasis on fault is expressly contradicted by the court's findings, which noted that father's fault in the breakup of the marriage was fully offset by mother's dissipation of marital assets through the filing of excessive motions and petitions, and thus that neither factor would be considered in the property division.

*Affirmed.*