2003 VT 109

## Leola Stryffeler BELL v. Daron SQUIRES

[845 A.2d 1019]

No. 02-314

¶ 1. December 10, 2003. Mother appeals a family court order awarding sole legal and physical custody of her two children to their natural father. Mother contends that the court erred by ignoring the best interests of the children, that it failed to give sufficient weight to her role as the children's sole care giver over the last three years, and that it wrongly punished her for resisting the court-ordered parent-contact schedule with father. We affirm.

¶ 2. This case began as a parentage action filed by the Office of Child Support against father to establish paternity, parental rights and responsibilities, and child support for the younger of his two children. Father, who had no contact with either child for three years, requested enforcement of parent-child contact against mother so he could see both children. The court ordered supervised visits "with the goal of establishing consistent, ongoing parent-child contact between the children and Dad." Mother's recalcitrance regarding visitation, however, led to a series of hearings and court interventions, appointment of a parent-coordinator, schedules for supervised contact, and the appointment of an attorney and guardian ad litem for the children. Despite these actions, the dispute over parent-child contact escalated, including repeated incidents in front of the children and unsubstantiated claims of sexual abuse filed by mother. Finally, in late 2001, father filed an emergency motion to modify parental rights and responsibilities seeking to obtain legal and physical custody over the children. It is

this custody dispute that is now before this Court.

¶ 3. The parties lived together from sometime in 1996 until October 1997, but were never married. They are the biological parents of two children. At the time of this appeal, the older child was seven and the younger was five. When the parents separated, mother was seventeen and pregnant with the younger child. The older child was thirteen months old. At separation, the parties stipulated to a relief from abuse order against father, but waived findings of abuse. The RFA order was later amended to provide for supervised visits between father and the older child. Father never exercised his right to see the child, and the RFA has since lapsed.

¶ 4. In January 2001, father's parentage of the younger child was established by genetic testing. Two case manager conferences were scheduled to determine parental rights and responsibilities. Mother was unavailable for both. The court then set the matter for a hearing in March, following which it issued a temporary order for parental rights and parent-child contact. The order awarded sole legal and physical custody of both children to mother, but gave father one hour, one day a week of supervised contact with his children. The court scheduled a follow-up hearing sixty days later to determine whether the supervised visits should continue.

¶ 5. By the time of that hearing, only one visit had occurred due to various reasons, including the inability of the supervisor, Family Tree Access Center (FTAC), to reach mother. Then, the second visit was marred by the first of what the trial court calls "many instances of inappropriate behavior by Mom in front of the children." After delivering the children for the visit, mother remained on the premises hidden in the bathroom contrary to the center's protocol. Later, when the younger child ran out of the supervised visitation room in the direc-

tion of the bathroom, father followed and picked up the child. Mother exited the bathroom screaming hysterically and accused father of taking the child to the bathroom. She told the center's director, in the presence of the children, that defendant had "molested the older child as an infant" and that she was afraid he would kill her and the children. Mother terminated the visit.

¶ 6. Two visits later, the parties agreed that father and a case worker would take the children to a restaurant. Mother followed them, again against the center's rules. While eating, the younger child climbed under the table. Father, in the presence of the supervisor, picked the child up. Later that day, mother reported to the same supervisor that she had seen father lift the older child and that the child was complaining about arm pain. She put the older child on the telephone, and the child told the supervisor about the arm pain. The next day mother advised that the arm had been x-rayed and showed a dislocation. FTAC officials requested copies of the medical records, but they were never provided. At trial, the supervisor testified that nothing untoward happened at the restaurant, and that father picked up the younger child, not the older child. As a result of these incidents, FTAC opted not to supervise any more visits until mother was able to abide by its visitation rules.

¶ 7. At the next hearing, in July, the court issued a revised parent-child contact schedule extending supervised contacts with father to two hours. The order also prohibited mother from being within 500 feet of any place where the contact was occurring or from causing any individual to follow, observe, or interfere with a visit. However, the conflicts continued. So, in August, the court referred the matter to a parent-coordinator with directions to help the parties achieve an extended, unsupervised contact schedule.

¶ 8. A month later, mother brought one of the children to the doctor's office to be

examined for sexual abuse. The doctor reported the allegations to Social and Rehabilitation Services. During the resulting investigation, mother reported three different stories to SRS: first, that she took the child to the doctor because something was wrong and only learned about the abuse while at the doctor's office; second, that the child told her about the abuse, which caused her to go to the doctor; and third, that the sexual assault occurred at FTAC and that she saw it happen. FTAC reported, however, that father had never once been left alone with either child. SRS concluded that the allegations were unsubstantiated. The investigation once again delayed expansion of contact between father and the children.

¶ 9. Mother raised many other obstacles. During the early visits, mother asked FTAC to prevent the children from eating any food supplied by father, out of fear that he might intentionally contaminate the food. Later, mother refused to allow visits to expand from five to seven hours as scheduled on grounds that the children came home hungry after visiting their father. Mother also objected to father's mother seeing the children, alleging that the grandmother had threatened to remove the older child from the hospital at birth, and had to be barred from seeing the newborn by hospital staff.

¶ 10. Despite court orders to the contrary, mother and her family continued to follow father, both during visitation periods and when he was alone or with his wife. Mother's father once followed father and his wife into a restaurant and, while standing immediately behind them in line, said that if they were talking about him, he "will become your worst nightmare." The court found that there was substantial credible testimony that for a year after the parties separated members of mother's family harassed father and threatened to falsely report him as a child molester. The court concluded that to some degree this explained why father had never sought to enforce contact with the older child.

¶ 11. The parent-coordinator's efforts to meet mother's new husband or mother's extended family were rebuffed. While on a conference call regarding the Christmas 2001 holidays with mother and an FTAC staffer, the parent-coordinator asked mother to go to another telephone because of screaming and shouting by other people at mother's location. Instead, mother called the police to complain that FTAC and the parent-coordinator were harassing her and her family. The police launched an investigation, and both FTAC and the parent-coordinator were told never to call the mother's home again. Ultimately, because of these complications, no holiday contact occurred between the children and father.

¶ 12. The court, however, ordered visits to resume. The next March, mother reported father for sexual abuse. In the resulting investigation, the child again failed to confirm the allegation and no physical evidence of abuse was found. SRS concluded that the report of abuse was unsubstantiated.

¶ 13. In late 2001, father petitioned the court to modify custody. After four days of hearings the court granted legal and physical custody to father. But, because of the age of the children, and the adjustment required in moving their primary residence, the court concluded that it was in the children's best interest to have extended contact with the noncustodial parent (now mother). Thus, the court ordered that the children shall reside with mother three weekends a month, plus alternating vacations and holidays. Mother now appeals.

¶ 14. A family court may change a custody order only when the best interests of the child so require. *Habecker v. Giard*, 2003 VT 18, ¶ 5, 175 Vt. 489, 820 A.2d 215 (mem.); 15 V.S.A. § 665. "The burden for such a showing remains on

the moving party, and, due to the value of stability in a child's life, it is a heavy one." *Habecker*, 2003 VT 18, at ¶ 5. In determining the best interests of the child, the court must take into account all relevant evidence, including the factors set forth in 15 V.S.A. § 665(b). *Cloutier v. Blowers*, 172 Vt. 450, 452, 783 A.2d 961, 963 (2001). Within the custody context, however, the family court has broad discretion.

> When reviewing the factual findings of a trial court we view them in the light most favorable to the prevailing party below, disregarding the effect of any modifying evidence, and we will not set aside the findings unless they are clearly erroneous. We will uphold factual findings if supported by credible evidence, and the court's conclusions will stand if the factual findings support them.

*Id.* (internal quotations and citations omitted). Although mother argues that the trial court's factual findings are generally not supported by credible evidence, she does not cite to any specific finding that is in error. Thus, we will not review the court's factual findings. See *In re Estate of Swinington*, 169 Vt. 583, 584 n.*, 733 A.2d 62, 63 n.* (1999) (mem.) (Court will not search the record for error on issues inadequately briefed).

¶ 15. Mother raises three claims of error regarding the family court's conclusion that the nine factors in 15 V.S.A. § 665(b) and the best interests of the children favored awarding custody to father. First, she argues that the court erroneously concluded that she could not foster a positive relationship between the children and their father under § 665(b)(5), and that the court improperly made this the dispositive factor in awarding custody to father. Second, she argues that the trial court should have instead given primary weight to the quality of the children's relationship with her under § 665(b)(6), and that this factor overwhelmingly favored her given that she was the children's primary caretaker since birth and the sole caretaker for three years. Third, she challenges the trial court's conclusion that the remaining § 665(b) factors were either neutral or favored giving custody to father. We disagree with all three claims.

¶ 16. Regarding the first claim, mother disputes the trial court's conclusion that she made little, if any, progress in recognizing the children's need to have contact with their biological father. Mother argues that this conclusion is "speculative," and contends that instead of her, "the biggest factor in the alienation of the Defendant from his children was his abandoning them during three of the most formative years of their young lives." Mother points to testimony by the parent-coordinator and FTAC staff that her concerns were genuine. She also argues that, although the process of reestablishing the children's relationship with an unknown father was difficult, the court's conclusion that she was trying to alienate the children from their father is refuted by the simple fact that the relationship had slowly, but steadily improved.

¶ 17. In looking to the record below, however, we find ample evidence to support the trial court's conclusion that mother and her family repeatedly acted to prevent the children from forming a positive relationship with father — both at the time of separation and today. The court heard substantial testimony that mother and her family members repeatedly harassed and threatened father in 1997 and 1998, thus causing him not to enforce his right to parent-child contact with the older child. The evidence also showed that once father did seek to enforce his right of contact beginning in 2001, the threats and harassment resumed. Mother made false reports of sexual and physical abuse; she accused father in front of his children of wanting

to "kill" her and them, and of contaminating their food; she refused to let supervised visits occur, missed visits, shortened visits; she made false police reports against FTAC staff; and she and her family harassed father and his new wife. The family court commented that mother's attempts to manipulate the court, FTAC, health care providers, and SRS in order to stop contacts was "unparalleled" in the court's experience, and concluded that the "credible evidence establishes by a landslide that it will be a long time coming, if ever, before Mom will have any ability to foster a positive relationship with Dad." Because this conclusion is amply supported by the court's findings, and the findings are well grounded in the evidence, we will not disturb it. *Begins v. Begins,* 168 Vt. 298, 301, 721 A.2d 469, 471 (1998) ("Given its unique position to assess the credibility of witnesses and weigh the evidence, we will not set aside the court's findings if supported by the evidence, nor its conclusions if supported by the findings.").

¶ 18. Moreover, we disagree that the trial court must wait until a parent actually succeeds in alienating the child from the other parent before applying this factor. See 15 V.S.A. § 665(b)(5) (requiring court to evaluate "the *ability and disposition* of each parent to foster a positive relationship and frequent and continuing contact with the other parent") (emphasis added). The court concluded that the evidence showed that the children "enjoyed their time with Dad," but rather than let that bond develop, mother continually sought to "instill[] fear and guilt in her [children] about that relationship." The mere fact that mother had not wholly succeeded in preventing the relationship from taking root is not a basis to reverse this conclusion, nor does it make the court's conclusions speculative or less weighty. To the contrary, as we have repeatedly observed, "'a child's best interests are plainly furthered by nurturing the child's relationship with

*both* parents, and a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent.'" *Begins,* 168 Vt. at 301, 721 A.2d at 472 (quoting *Renaud v. Renaud,* 168 Vt. 306, 309, 721 A.2d 463, 466 (1998)).

¶ 19. Mother's second argument is that the trial court erroneously gave too much weight to 15 V.S.A. § 665(b)(5), and should instead have looked primarily to the sixth factor, "the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development." 15 V.S.A. § 665(b)(6). Generally this factor is dependent upon the quality of the child's relationship with the custodial parent and is "entitled to great weight unless the primary custodian is unfit." *Harris v. Harris,* 149 Vt. 410, 418, 546 A.2d 208, 214 (1988). In the absence of evidence of the likely effect of the change of custody on the child, as mother alleges happened here, "the court should ordinarily find that the child should remain with the primary custodian if that parent is fit." *Id.* at 419, 546 A.2d at 214.

¶ 20. We disagree with mother's premise that there was insufficient evidence of the quality of mother's relationship with the children or of the likely effect of the change of custody on the children. The court found that although mother and the children have a close bond, the quality of their relationship is negatively affected by mother's quick temper, her habit of negative interactions with others in front of the children, the extreme disproportion between her fears and actual circumstances, her apparent inability to draw appropriate boundaries between herself and her extended family in making decisions about her children, and her failure to focus on the children's needs as opposed to her own or those of her extended family. In contrast, the court concluded that father had shown that he was better able to foster positive emo-

tional development of the children, that he could provide a safe and stable environment, and, most importantly, that he was willing to put their needs ahead of his own, as evidenced by "his repeatedly agreeing to unrealistic demands of Mom in an effort to implement a normalized contact schedule." The court appropriately weighed this evidence and the other statutory factors in concluding that a change of custody would be beneficial to the children. Thus, we find no error. Cf. *Habecker*, 2003 VT 18, at ¶ 14 (fact that mother was primary care giver outweighed by father's superior ability to, inter alia, place children's needs ahead of his own, to foster communication with mother, and to encourage a positive relationship between her and children).

¶ 21. Lastly, mother argues that the court wrongly concluded that the remaining relevant factors favored father, not her. See 15 V.S.A. § 665(b)(1)-(5), (7), (9). Our review of the record, however, indicates that the trial court had sufficient evidence to support its findings and conclusions on factors (1), (2), (3), (4), and (9). Regarding the seventh factor, "the relationship of the child with any other person who may significantly affect the child," 15 V.S.A. § 665(b)(7), mother argues that the court failed to consider the impact a change of custody would have on the children's relationship with their maternal grandparents, their stepfather, whom they called "Daddy," and their half-brother. The court acknowledged these relationships, but noted that it could not ascertain the nature of the relationships due to mother's failure to provide relevant evidence. The parent-coordinator was never allowed to meet the stepfather, nor did he testify. Although mother's father testified, mother elicited no evidence regarding her parent's interactions with the children. Given mother's failure to proffer relevant evidence on this factor, we find no error. See *Poulin v. Upham*, 149 Vt. 24, 26 n.*, 538 A.2d 181, 182 n.* (1987) (although court must consider each 15 V.S.A. § 665(b) factor, "if no evidence is presented as to a particular factor, no findings need be made with respect to it"). Moreover, we note that the court's findings as a whole indicate that it took this factor into consideration in reaching its decision and, to some degree, accounted for the importance of these relationships by increasing mother's parent-child contact beyond that proposed by the parties. *Harris*, 149 Vt. at 413-14, 546 A.2d at 211 (specific findings tied to each factor unnecessary; it is sufficient if the findings as a whole reflect that trial court took all statutory factors into consideration, in so far as they are relevant, in reaching its decision).

*Affirmed.*