2010 VT 98

### Lisa MILLER-JENKINS v. Janet MILLER-JENKINS

[12 A.3d 768]

No. 09-473

¶ 1. October 29, 2010. Lisa Miller appeals a family court decision modifying parental rights and responsibilities by awarding her expartner, Janet Miller-Jenkins, sole physical and legal custody of their minor child, IMJ, with visitation rights for Lisa to be determined at a later point. Lisa argues that the order violates her fundamental constitutional rights as IMJ's biological parent and that several of the family court's factual findings and conclusions of law warrant reversal. We affirm, and we also order further proceedings to occur at the time of the transfer of custody.

¶ 2. Many of the background facts of this case are recounted in this Court's decision in *Miller-Jenkins v. Miller-Jenkins (Miller-Jenkins I)*, 2006 VT 78, 180 Vt. 441, 912 A.2d 951. They can be briefly summarized as follows. Lisa and Janet obtained a civil union in Vermont in December 2000. Soon after the civil union, the parties decided to have a child through artificial insemination, whereby Lisa would be the bearing mother. The parties, working together, chose a sperm donor, and Janet was present in the delivery room when IMJ was born in April 2002. Lisa, Janet, and IMJ lived in Vir-

---

[2] We state no opinion on the legal basis or applicability of this standard.

ginia until August 2002 when they moved to Vermont. They raised IMJ together for the first seventeen months of IMJ's life, and then the couple separated. In September 2003, Janet helped Lisa move back to Virginia with IMJ, while Janet remained in Vermont.

¶ 3. In November 2003, Lisa filed a pro se complaint in the Vermont family court to dissolve the parties' civil union. The family court issued a temporary order on June 17, 2004, awarding Lisa temporary legal and physical responsibility for IMJ. The court also set a visitation schedule for Janet, in addition to mandating daily telephone contact between Janet and IMJ. Lisa, however, allowed Janet parent-child contact only once in June 2004 and did not allow Janet to have any telephone contact with IMJ. On September 2, 2004, the Vermont family court found Lisa in contempt for willful refusal to comply with the court's June 2004 visitation order.

¶ 4. Lisa sought interlocutory appeal of three orders of the Vermont family court: (1) the June 2004 order allowing Janet visitation rights; (2) the September 2004 order finding Lisa in contempt for refusing to comply with the visitation order; and (3) the November 2004 order finding that both Lisa and Janet have parental interests in IMJ. After thoroughly examining all of these issues, this Court affirmed all orders by the lower court. *Miller-Jenkins I*, 2006 VT 78, ¶ 72. We concluded that (1) the parties' civil union was valid; (2) the family court had jurisdiction to dissolve the civil union; (3) the family court had jurisdiction to award Janet visitation with IMJ; (4) the family court was not required to recognize or enforce a Virginia trial court decision denying Janet any claims of parentage or visitation of IMJ; and (5) the record supported the conclusion that Lisa was in contempt of court for willfully violating the June 2004 temporary visitation order. *Id.*

¶ 5. In June 2007, following trial on parental rights and responsibilities, the family court issued findings of fact and conclusions of law. In accordance with 15 V.S.A. § 665(b), the court considered each of the nine statutory factors for determining parental rights and responsibilities with regard to IMJ. Though many of the factors weighed evenly between the parties, the court found that Janet had the ability to foster a positive relationship with Lisa, while Lisa demonstrated through her "contemptuous refusal to permit parent-child contact" that she could not foster such a relationship. The court, however, concluded that the potential harm that could result from uprooting IMJ outweighed the potential harm from Lisa's inability to foster a relationship with Janet. The court therefore ordered sole physical and legal custody of IMJ to go to Lisa, subject to Janet's visitation rights. The court also ordered the civil union to be dissolved and assets to be distributed. At this time, the court warned Lisa that continued interference with the relationship between IMJ and Janet could lead to a change of circumstances warranting a modification of custody.

¶ 6. Lisa again appealed the family court's order to this Court, arguing, among other things, that awarding any parent-child contact to Janet violated Lisa's constitutional rights as IMJ's sole biological parent. In a three-justice entry order, we declined to address most of Lisa's arguments, since they had already been resolved by this Court's decision in *Miller-Jenkins I*. See *Miller-Jenkins v. Miller-Jenkins (Miller-Jenkins II)*, No. 2007-271, 2008 WL 2811218, at **1-2 (Vt. Mar. Term 2008) (unpub. mem.), available at http://www.vermontjudiciary.org/d-upeo/upeo.aspx. We noted that because no new evidence or facts were adduced at trial, there was no need to revisit those same issues. *Id.* at *1.

¶ 7. In the custody modification order currently on appeal, the family court made the following findings of fact with

respect to Lisa and Janet's relationship and parent-child contact between Janet and IMJ. In recent years, court-ordered parent-child contact between Janet and IMJ has occurred infrequently at best. Since 2007, Lisa has violated several visitation orders and, during these years, the family court has found her in contempt of court a total of seven times for violating numerous parent-child contact orders. Throughout 2008 and 2009, Janet and IMJ had parent-child contact for a total of approximately 48 hours. During these two years, Janet made several trips to Virginia to visit IMJ in accord with the court-ordered visitation schedule, but Lisa did not allow contact. Further, Lisa asked Janet's mother and father to stop contacting IMJ and to stop referring to themselves as "Mom-mom" and "Pop-pop" in front of IMJ. It also found that Janet's parents live near IMJ in Virginia and have seen IMJ only four times in 2008 and 2009. At a January 2009 hearing, the court again explicitly warned Lisa that continued failure to comply with court-ordered visits could lead to a transfer of custody to Janet. The court noted that Lisa then testified that she would comply with the ordered visits, although she now challenges this finding.[1] Because of the lack of parent-child contact, Janet filed two consecutive motions to transfer custody to herself. The first motion was denied, and a hearing on the second motion was held on August 21, 2009. Lisa did not appear or testify at that hearing.

¶ 8. The family court noted that, by the time of the August 2009 hearing, Lisa had been noncompliant with visitation orders for ten months. Lisa had interfered with over eight weeks of court-ordered visitation between IMJ and Janet. The court also found that Lisa's intention was to terminate all parent-child contact between Janet and IMJ. In light of these findings, the court concluded that Lisa's willful interference with Janet's visitation rights amounted to a real, substantial, and unanticipated change in circumstances. After analyzing how IMJ's interests would be best served, the court awarded Janet sole physical and legal custody of IMJ. Lisa appealed to this Court.[2]

¶ 9. Lisa makes three arguments in support of reversing the family court's decision awarding Janet custody. One argument is a broad-based challenge to various findings of fact and conclusions of law made by the family court. Lisa also makes two specific constitutional arguments: (1) that a transfer of custody to Janet violates her fundamental parental rights as the sole biological parent of IMJ; and (2) that the family court deprived Lisa of due process in the custody transfer.

## I.

¶ 10. We first address Lisa's challenges to the family court's findings of fact and legal conclusions. Lisa argues that the transfer of custody is against IMJ's best interests. As an initial matter, we raise two principles of law that guide this Court when we address appeals on family court matters. First, it bears repeating that the family court's sole focus in a custody

---

[1] We need not reach whether Lisa actually testified on this point, as she is, of course, obligated to obey court orders regardless of whether she said she would. Even if incorrect, unessential findings are not grounds for reversal. *Greenberg v Hadwen*, 145 Vt. 112, 115, 484 A.2d 916, 918 (1984).

[2] Janet now claims that Lisa has disappeared with IMJ. Janet points to Lisa's attorneys' motion to withdraw representation as evidencing this disappearance. In the motion, Lisa's attorneys stated that they were unable to reach Lisa and had not spoken to her since the contested order was issued, though they appeared at oral argument.

dispute must be the best interests of the child. See, e.g., *Begins v. Begins*, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998). Although the parents are the ones who appear before the court in a custody dispute, and it is therefore "easy to become caught up in their rights and interests rather than the child's welfare," *Price v. Price*, 149 Vt. 118, 125, 541 A.2d 79, 83 (1987), the family court must not take into consideration the competing, often antagonistic, desires of the parents without upsetting the delicate nature of custody proceedings and trivializing the welfare of the child. In determining what is in the best interests of a child, it is appropriate and necessary to look at the parents' past actions to determine whether they will be able to abide by whatever visitation schedules and other requirements the court determines are in the child's best interests.

¶ 11. The second principle is that this Court is deferential to family court findings of fact. In the face of a motion to modify parental rights, the family court has broad discretion to determine the best interests of the child. *Sundstrom v. Sundstrom*, 2004 VT 106, ¶ 37, 177 Vt. 577, 865 A.2d 358 (mem.). The family court's unique position as trier of fact allows it alone to evaluate the witness' credibility and the weight that evidence should be afforded in making this assessment. *Kasser v. Kasser*, 2006 VT 2, ¶ 19, 179 Vt. 259, 895 A.2d 134. In highly fact-intensive situations, such as custody determinations, we as an appellate court "place substantial reliance on determinations of fact and credibility made by the family court." *Velardo v. Ovitt*, 2007 VT 69, ¶ 18, 182 Vt. 180, 933 A.2d 227.

¶ 12. As a result, when this Court reviews factual findings, we view them in the light most favorable to the prevailing party below and, excluding the effect of modifying evidence, will set aside factual findings only if found to be "clearly erroneous." *Stickney v. Stickney*, 170 Vt. 547,

548, 742 A.2d 1228, 1230 (1999) (mem.). If any reasonable and credible evidence supports such findings, they will stand. *Id.* Reversal is warranted only if the court's findings are not supported by the evidence or if its legal conclusions are not supported by the findings. *Cloutier v. Blowers*, 172 Vt. 450, 452, 783 A.2d 961, 963 (2001).

¶ 13. We follow a two-pronged procedure in determining a transfer of custody. *Pill v. Pill*, 154 Vt. 455, 459, 578 A.2d 642, 644 (1990). First, the moving party must show a real, substantial, and unanticipated change of circumstances. *Id.* Second, and only after a finding of changed circumstances, the family court determines whether the best interests of the child will be served by a change in custody. *Id.* We agree with the family court's conclusion, which Lisa does not challenge, that her willful and calculated noncompliance resulted in a qualifying change of circumstances.

¶ 14. This finding then required the court to delve into an analysis of IMJ's best interests. Guided by the factors listed in 15 V.S.A. § 665(b), the court examined whether a change in parental responsibilities was in IMJ's best interests. The court concluded that many of the factors weighed evenly between the two parents, as they did in June 2007 when the trial court issued its earlier ruling. Two factors — the ability of the parents to communicate and cooperate where parental rights and responsibilities are shared or divided, as well as evidence of abuse — bore no weight in the court's decision. One factor weighed in favor of Lisa: IMJ's adjustment to her present housing, school, and community, and any change that the custody transfer might create. Three factors were in Janet's favor: (1) Janet could foster a relationship and continuing contact with Lisa; (2) Janet would not block IMJ from seeing Lisa's family; and (3) Janet had a superior ability to guide IMJ, especially given Li-

sa's noncompliance with orders that the court deemed to be in IMJ's best interests. The court noted that the first two of these factors weighed "heavily" in Janet's favor.

¶ 15. The family court concluded that the long-term benefits of the change in custody would outweigh any short-term disruptions to IMJ. Citing *Bell v. Squires*, the court reiterated that a child's best interests are "plainly furthered by nurturing the child's relationship with *both* parents, and a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent." 2003 VT 109, ¶ 18, 176 Vt. 557, 845 A.2d 1019 (mem.) (quotation omitted). The court concluded that the change in custody would ultimately be in the best interests of IMJ, as she would have the opportunity to maintain physical and emotional contact with both parents.

¶ 16. Lisa's first claim of error is the family court's finding that Janet would foster a good relationship between Lisa and IMJ. Lisa argues that Janet has been openly hostile to Lisa, and that when IMJ visited Janet, Lisa could not reach IMJ or Janet by telephone. Janet, however, testified, and the family court found, that Lisa has repeatedly refused to comply with court-ordered parent-child contact between IMJ and Janet. Janet further testified that she would never block Lisa's visitation time or communication between Lisa and IMJ. In fact, Janet stated that she would allow liberal contact between Lisa and IMJ and had even bought a webcam to facilitate such contact whenever IMJ was with Janet. The finding that Janet would foster a good relationship between Lisa and IMJ is supported by the evidence on the record. This finding is therefore not clearly erroneous, and we will not overturn it.

¶ 17. Second, Lisa contends that the trial court erred in finding that Janet had demonstrated an ability to communicate and cooperate with Lisa. The family court, however, found that Janet made numerous trips to Virginia only to have the court-ordered parent-child contact not occur and that, since at least 2007, Lisa has engaged in enmeshed parenting whereby she has fostered an alliance with IMJ against Janet. Janet testified that she had no animosity toward Lisa. Thus, the family court's finding that Janet would communicate and cooperate with Lisa is amply supported by the evidence.

¶ 18. Next, Lisa assigns error to the family court's finding that Janet indicated a willingness to respect Lisa's religious and moral instruction of IMJ. Specifically, Lisa points to Janet's testimony that she would not bring IMJ to a church that teaches "hatred and bigotry." Janet did not say she would prevent Lisa or anyone else from taking IMJ to any particular church, only that, although Janet would like to be able to attend church with IMJ, she would not personally take IMJ to a church that promotes such beliefs. Janet further testified that a Baptist church was acceptable, and that she knew IMJ's attorney attended a Baptist church and would allow IMJ to attend with her.[3] Janet also testified that she would involve IMJ in children's programs at church. Janet's testimony supports the family court's finding that Janet would respect Lisa's religious and moral instruction of IMJ.

¶ 19. Fourth, Lisa argues that it was clearly erroneous for the family court to find no abuse of IMJ by Janet.[4] The

---

[3] Two attorneys were present at the August 2009 hearing on behalf of IMJ. One of them attends a Baptist church in Vermont. Janet testified that IMJ's attorney could bring her to the church.

[4] Lisa submitted an affidavit to the family court that contained several unsubstantiated statements alleging abuse. The affi-

family court explicitly rejected these claims when it held that IMJ had never been abused by either parent. Finding that there had been no abuse in the family by either parent, the court did not assign any weight to this factor in its consideration. The family court's earlier decision in June 2007 similarly found Lisa's proffered evidence of Janet's alleged abusive behaviors not credible. Lisa's brief before this Court now launches several additional unsupported accusations, which were either never presented to the family court or were rejected by that court as speculative and unsubstantiated. We find no reason to disturb the court's findings on this point.

¶ 20. Lisa's next assignment of error is the family court's finding that Lisa had no justification for denying parent-child contact with Janet. The family court, however, stated that Lisa's "non-compliance . . . has been willful and calculated, and the Court has found her in contempt of numerous orders which set forth specific dates and locations for parent-child contact between [Janet] and IMJ. There is no justification for [Lisa]'s interference with [Janet]'s visitation rights." Lisa states that the reasons she has denied Janet parent-child contact were twofold: (1) IMJ's alleged behavior following visits with Janet was indicative of abuse; and (2) Janet's sexual orientation negatively affected IMJ's health. Both alleged justifications are meritless.

¶ 21. Regarding the first proffered justification (the claim that IMJ's behavior after visits with Janet was indicative of abuse), as discussed earlier, the family court correctly found the allegations of abuse to be wholly unfounded and, again, did not weigh this factor against either parent. This case is not a situation like that which we addressed in *Renaud v. Renaud*, where we held that the custodial

davit, however, was not admissible evidence.

parent could justify some alienation because she reasonably suspected abuse. 168 Vt. 306, 311, 721 A.2d 463, 467 (1998). In *Renaud*, the child's mother consulted with two therapists and a pediatrician before making allegations of abuse, did not appear to be "acting out of malice or spite," and her actions were "transitory, unlikely to be repeated, and subject to cure" and were thus justifiable. 168 Vt. at 311, 313, 721 A.2d at 467-68. By contrast, in this case Lisa did not justify her interference with Janet's visitation with credible evidence of abuse, nor did her alienating behavior appear to be transitory or subject to cure. Without any reasonable suspicion of abuse, Lisa's interference with court-ordered parent-child contact was not justified.

¶ 22. Regarding the second proffered justification (the claim that Janet's sexual orientation negatively affected IMJ's health), the family court cut off this argument at the hearing by noting that Janet is a legal parent of IMJ and that her sexual orientation is irrelevant. The judge correctly stated that this "issue has never been presented in the case, and I don't see any reason at this point that it needs to be presented now." The State of Vermont has determined that same-sex couples have the same rights and responsibilities as opposite-sex couples — thus, the sexual orientation of the parents is irrelevant in a custody determination. See 15 V.S.A. § 1204(a) ("Parties to a civil union shall have all the same benefits, protections, and responsibilities under law, whether they derive from statute, administrative or court rule, policy, common law, or any other source of civil law, as are granted to spouses in a civil marriage."). We affirm the family court's finding that Lisa had no justification for denying visitation to Janet.

¶ 23. Lisa also argues that the family court erred in applying the factors set forth in § 665(b) and consequently erred in awarding custody to Janet. We must

uphold the family court's conclusions unless they are not supported by the findings. *Cloutier*, 172 Vt. at 452, 783 A.2d at 963. Lisa contends that the court erred in concluding that Janet and IMJ have a good relationship. She argues that the expert who testified on behalf of Janet — to the effect that IMJ and Janet have a good relationship — based her testimony on "pure speculation." The expert testified that parent-child bonding and attachment takes place between birth and two years of age. The expert concluded that if Janet and IMJ formed an attachment in IMJ's early years, that emotional bond would likely not disappear. Lisa does not contend that the span of time that the expert reviewed — Janet's and IMJ's relationship from birth to seventeen months of age — was improper. Rather, she urges that because the expert did not observe any interaction between IMJ and Janet before IMJ moved away, she could not testify as to any bonding between the two. The family court, however, found that both Lisa and Janet cared for IMJ extensively in her infancy and beyond and that both have the ability and disposition to provide her with love and affection. These findings, combined with the expert testimony, support the family court's conclusion that Janet has a good relationship with IMJ.[5]

¶ 24. In challenging the family court's conclusions, Lisa states that no court has ever found her to be an unfit parent. Because the family court found that Lisa was capable of providing adequate food, clothing, medical care, and a safe environment, Lisa contends that there is no

support for the family court's conclusion that her refusal to comply with earlier court orders diminished her fitness as the custodial parent. This argument is misplaced. In analyzing each parent's ability to provide love, affection, and guidance to IMJ, the court quoted *Wells v. Wells*, where we noted that "[t]o deliberately sabotage visitation rights calculated to serve the best interests of children bears adversely on the fitness of the custodial parent, whose conduct most certainly does not go unnoticed by the children." 150 Vt. 1, 4, 549 A.2d 1039, 1042 (1988) (quotation omitted). The family court concluded that Lisa's contemptuous behavior bore negatively on her ability to provide guidance to IMJ, not on her ability to provide food, clothing, or shelter. The use of the word "fitness" does not negate this conclusion.

¶ 25. Ultimately, the family court determined that it is in the best interests of IMJ to be in the custody of Janet. This determination was supported by the court's findings, and we conclude that there is no basis to disturb it. The best interests of the child remain paramount in all custody decisions, and a decision to transfer custody cannot be based on a desire to punish the alienating parent. See *Renaud*, 168 Vt. at 309, 721 A.2d at 466. That said, a child thrives when he or she has the love and support of both parents. One parent's attempts to hamper the other's parent-child relationship therefore typically demonstrates a lack of regard for the child's best interests and suggests that a transfer of custody may well be in the child's best interests. See *id.*; see also, e.g., *Meyer v. Meyer*, 173 Vt. 195, 200, 789 A.2d 921, 924-25 (2001) (upholding trial court's decision to transfer custody to mother, in part, because extensive evidence established father's attempts to alienate children from mother); *Wells*, 150 Vt. at 4, 549 A.2d at 1042. Further, the family court's decision to transfer custody was not based solely on

---

[5] That said, our decision today takes into account the fact that IMJ's prolonged separation from Janet calls for an additional hearing to reevaluate that relationship and ensure that the transfer of custody is done in the manner that is most conducive to the best interests of IMJ. See *infra*, part III.

Lisa's alienation of IMJ from Janet; it was also based on Lisa's alienation of IMJ from Janet's parents, which the court deemed to be against IMJ's best interests. See 15 V.S.A. § 665(b)(7) (noting that one factor that must be considered in determining best interests of child is relationship of child with any other person who may significantly affect the child). For these reasons, we find no basis to overturn the court's findings of fact or conclusions of law regarding the decision to transfer custody.

¶ 26. We are aware of the national attention that this case has gained, and the potential for parties to these proceedings to be influenced by matters not before this Court in a way that is not conducive to the best interests of this child. While Lisa might believe that all of her actions have been done out of concern for IMJ's best interests, we conclude that a mother disappearing with a child, apparently to defeat a lawful court order, is destructive to the best interests of that child. The evidence before the family court supports the conclusion that Janet has been acting with IMJ's best interests in mind throughout these proceedings and that a transfer of custody will, in the long run, benefit IMJ and provide her with a loving and stable home with access to both of her parents. By contrast, the evidence reveals that Lisa has demonstrated contempt both for the courts of this jurisdiction and for the reasoned laws passed by our Legislature.

## II.

¶ 27. Turning to Lisa's constitutional claims, Lisa argues that the family court violated her fundamental parental rights when it transferred custody to Janet. Lisa contends that a transfer of custody to a nonbiological, nonadoptive parent violates her fundamental parental rights as the sole biological parent of IMJ. She also argues that her due process rights were violated when the family court failed

to perform some minimal constitutional analysis before transferring custody. Citing the United States Supreme Court decision of *Troxel v. Granville*, 530 U.S. 57 (2000), Lisa contends that specific procedures are required before a transfer of custody can take place and that her custodial preference should be awarded "some special weight."

¶ 28. Except in the limited sense discussed in paragraph 32 *infra*, we do not reach these arguments because none of them were properly preserved before the trial court. Failure to preserve issues below results in waiver, even of constitutional issues. *State v. Hinchliffe*, 2009 VT 111, ¶ 31, 186 Vt. 487, 987 A.2d 988. Issues not raised with specificity and clarity, and in a manner which gives the trial court a fair opportunity to rule on them, are also waived. *State v. Ben-Mont Corp.*, 163 Vt. 53, 61, 652 A.2d 1004, 1009 (1994). Here, Lisa filed no opposition to the motion to transfer custody, and, as a result, the family court order did not address any constitutional matters regarding Lisa's parental rights as IMJ's sole biological parent nor any due process concerns. Lisa contends that an affidavit introduced at the end of the August 2009 hearing preserved her constitutional arguments by including a bold subheading about how a transfer of custody "Would Violate Lisa's Fundamental Rights as [IMJ's] Biological Mother," and by stating the following:

> I realize this Court, and the Vermont Supreme Court, have heard me argue before that it would violate my parental rights to either declare Janet a de facto parent to [IMJ] or to grant Janet visitation. I beg this Court to consider the even more serious constitutional implications of actually taking [IMJ] away from her biological parent.

¶ 29. Nothing further whatsoever, legal or factual, was offered in support of this

purported assertion of constitutional rights. At the hearing, Lisa did not appear in person or by telephone, and her attorney at the hearing made no intimation of the constitutional arguments now set forth on appeal. Nor did her attorney introduce any evidence or elicit any testimony to provide the trial court with a basis to rule on such constitutional grounds.[6] Following the hearing, Lisa's attorney submitted proposed findings of fact and conclusions; nowhere in that document did Lisa's attorney make any constitutional arguments. Further, constitutional matters in the family court's findings and conclusions are conspicuously absent, likely because the court was not informed that they were at issue. See *Malinowski v. Farnam*, 174 Vt. 527, 529, 811 A.2d 177, 179 (2002) (mem.) (supporting decision to preclude mother's constitutional argument on appeal with the fact that "the family court never ruled on the issues presented on appeal, likely because the judge never thought they were before him").

¶ 30. Thus, the brief excerpt cited above from Lisa's affidavit was the only attempt to identify constitutional concerns to the trial court, and it lacked the specificity that is required to preserve constitutional claims. Lisa's affidavit refers only to "serious constitutional implications," and does nothing more to explain the nature of those concerns. In analogous circumstances, we have previously held that the mere mention of fair warning in a pretrial motion was not enough to preserve a due process claim on appeal. *Ben-Mont*, 163 Vt. at 61, 652 A.2d at 1009. For these reasons, Lisa failed to preserve her constitutional claims.

¶ 31. In civil cases, this Court generally does not review unpreserved constitu-

tional claims, except in "limited circumstances, i.e., when an appellant raises a claim of deprivation of fundamental rights." *Follo v. Florindo*, 2009 VT 11, ¶ 16, 185 Vt. 390, 970 A.2d 1230; see also *Varnum v. Varnum*, 155 Vt. 376, 383, 586 A.2d 1107, 1111 (1990) (finding balance between litigant's fundamental rights and avoidance of lengthy court process impacting children's well-being tipped in favor of limited review in custody case). In the situations where we grant limited review, we ask only whether there has been a "fundamental miscarriage of justice that we cannot overlook." *Varnum*, 155 Vt. at 383, 586 A.2d at 1111. In particular, we must consider the "weighty countervailing interests of children." *Id.*

¶ 32. Here, we find no fundamental miscarriage of justice. The trial court underwent a careful examination of the circumstances of this case and focused its analysis on the best interests of IMJ. Lisa attempts to draw a distinction between her rights as the sole biological parent of IMJ and the rights of Janet. In *Miller-Jenkins I*, we explicitly held that no such distinction exists and that Janet was a legal parent of IMJ and was entitled to all parental rights flowing therefrom. 2006 VT 78, ¶¶ 55-61. In that case, Lisa similarly argued that, under the United States Supreme Court's decision in *Troxel*, awarding Janet visitation rights without first finding that Lisa was unfit was a violation of Lisa's fundamental right to parent her child. Although this argument was unpreserved, we nonetheless addressed and rejected it. *Id.* ¶ 59 ("Janet was awarded visitation because she is a parent of IMJ. Lisa's parental rights are not exclusive.").[7] For similar

---

[6] At oral argument, Lisa's counsel conceded that trial counsel did not raise any constitutional issues at the August 2009 hearing.

[7] Lisa made the same argument under *Troxel* a second time before this Court in *Miller-Jenkins II*, where we declined to address the issue because it was previously resolved in *Miller-Jenkins I*. Lisa appealed both of this Court's decisions to

reasons, Lisa's current arguments fare no better, and we find no fundamental miscarriage of justice warranting reversal.

### III.

¶ 33. We affirm the family court's order to transfer custody from Lisa to Janet. We are, however, under no delusions that a transfer of custody is simple under even the best of circumstances. We are mindful of the fact that much time has passed since Janet and IMJ spent a significant amount of time together. We are also aware that the family court found that Lisa is the cause of this estrangement. As reflected below, the family court should have great discretion at the hearing called for in the mandate of this order to reevaluate Janet's relationship with IMJ at that time and ensure a transition that comports with the law's intent to defend and protect IMJ's best interests. Cf. *In re Stacks*, 406 So. 2d 979, 980-81 (Ala. Civ. App. 1981) (holding that where child was in care of grandmother for much of his life, trial court was correct in delaying permanent transfer of custody to child's mother to allow child to become reacquainted with her and to "prevent the trauma to him of an abrupt removal").

¶ 34. Because this Court desires to minimize any further trauma to IMJ, we anticipate her best interests will be met only by way of a specific plan to ensure a successful and safe transition. We therefore direct that, at the time that IMJ is located and the transfer of custody occurs, the family court shall (1) hold a hearing to reevaluate Janet's current relationship with IMJ and establish a plan for the transfer of physical custody to Janet; and (2) set a visitation schedule for

the United States Supreme Court, which declined to hear either case. 550 U.S. 918 (2007) (mem.) (denying certiorari in *Miller-Jenkins I*); 555 U.S. 888, 129 S. Ct. 306 (2008) (mem.) (denying certiorari in *Miller-Jenkins II*).

Lisa with IMJ, if feasible. In all of these matters, the court will continue to keep IMJ's best interests paramount.

*Affirmed, with directions to hold a hearing at the time of the transfer of custody.*

¶ 35. **Skoglund, J.,** concurring. As a result of one parent's efforts to deny another parent contact with their child, at the time of the trial court's decision Janet Jenkins had essentially not seen her then seven year old daughter for over two years. The trial judge acknowledged that Lisa Miller's repeated interference with Janet's visitation rights had reached a point "where [Janet] is no longer a part of her daughter's life." The court also noted in its June 2007 order that it had already found the relationship between the child and Janet had been significantly affected by Lisa's refusal to allow parent-child contact. The court concluded in 2009 that "[t]his situation has only become worse since that time." Even so, the family court and majority both conclude that Janet "has a good relationship with IMJ" for the purposes of a best-interest analysis under 15 V.S.A. § 665(b). *Ante,* ¶ 23. Given the length of time in this child's short life without *any* real relationship with her mother, Janet, I cannot find support for this conclusion. *Cloutier v. Blowers,* 172 Vt. 450, 452, 783 A.2d 961, 963 (2001) ("We will . . . reverse if the court's findings are not supported by the evidence, or if its conclusions are not supported by the findings." (citations omitted)). While I concur with the majority's decision — especially in light of the hearing the Court mandates to reevaluate Janet's relationship with IMJ before transitioning custody — I write to highlight the necessary inconsistency in the family court's ruling.

¶ 36. The pertinent findings in this case are uncontested. Lisa has prevented Janet from seeing their daughter IMJ for, now, the past three years. The family court found that Janet had had twenty-four hours of contact with IMJ in all of

2008 and again only twenty-four hours in 2009. Indeed, from the family court findings, it appears that apart from these two visits, Janet has not had contact with her daughter since August 2007 and had only limited contact before then. The court concluded that Janet has a good relationship with her daughter by viewing the evidence "from the perspective of the time preceding [Lisa]'s initial termination of parent-child contact." While we have held that the best-interests inquiry should focus on all relevant periods of a child's life and not exclusively on the period immediately preceding trial, *Nickerson v. Nickerson*, 158 Vt. 85, 90, 605 A.2d 1331, 1334 (1992) ("A contrary holding may cause a primary-care-provider wishing to leave the home to uproot children from the marital residence solely to remain, in the view of the court, the primary-care-provider."), I suggest it is illogical and potentially harmful to simply ignore the reality of this child's experience. I do not understand how a court can draw any conclusions about the current relationship between a mother and her daughter when the two have not spent significant time together for more than two years — a large portion of the daughter's life.

¶ 37. I do not lightly note this inconsistency. As we have recognized in the past, the family court should not construe the application of the § 665(b) best-interest factors in a manner that gives incentive for wrongdoing by a parent. See, e.g., *id.* That said, we likewise cannot ignore the plight of children whose relationships are significantly disrupted and/or distorted when one parent chooses to prevent another from contact. Parental kidnaping is the most common form of abduction in the United States with more than 200,000 children victims each year. Office of Juvenile Justice & Delinquency Prevention, U.S. Dep't of Justice, *The Crime of Family Abduction: A Child's and Parent's Perspective* iii-iv (2010), available at http:// www.ncjrs.gov/pdffiles1/ojjdp/229933.pdf. Its impacts last far longer than the search for and recovery of a missing child, especially for a child whose trust in both parents may have been seriously damaged. See *id.* at 37 ("To many parents, the recovery might seem like a moment of celebration, but to the child, it may feel like another abduction." (citation omitted)). Simply because Janet had a strong relationship with her daughter before the current estrangement, the family court cannot assume that such a bond still exists.

¶ 38. I concur with the majority's result because exclusion of this factor would not shift the family court's ultimate conclusion.